518 A.2d 164

## UNITED PARCEL SERVICE, INC.

v.

## COMPTROLLER OF the TREASURY.

**No. 497, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

Dec. 9, 1986.

Ralph S. Snyder of Philadelphia, Pa. (Roger D. Redden and Paul A. Tiburzi, on the brief), Baltimore, for appellant.

Linda Koerber Boyd, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen. and Deborah B. Bacharach, Asst. Atty. Gen., on the brief), Baltimore, for appellee.

Argued before WEANT, BISHOP and KARWACKI, JJ.

BISHOP, Judge.

United Parcel, Inc. (UPS or appellant) filed claims for refunds of Maryland sales and use taxes that it alleges to have paid erroneously for the period January 1, 1977 through July 31, 1980. The Comptroller of the Treasury, Retail and Sales Tax Division (Comptroller or appellee), refused to refund $98,363.68 of UPS's claims and then on September 24, 1980 assessed an additional $38,181.77 for unpaid sales and use taxes plus penalty and accrued interest. The total amount in dispute is approximately $146,-200.00.

After conducting a formal hearing, the Hearing Officer for the Comptroller affirmed the tax assessment and denied appellant's claims for refunds. This determination was reversed by the Tax Court, which held that the rental of delivery vans and the purchases of replacement parts and accessories for these and other vans were exempt from sales and use taxes pursuant to article 81, subsections 326(f), 326(gg), and 375(b) of the Maryland Code. From

that decision, the Comptroller appealed to the Circuit Court for Prince George's County where Judge G.R. Hovey Johnson overturned the Tax Court's determination and reinstated the Comptroller's tax assessment and denial of UPS's requests for refunds.

Appellant raises three issues on appeal:

I. Whether the circuit court applied the correct standard of review when it reversed the Tax Court's decision;

II. Whether the Tax Court correctly ascertained the scope of the sales and use tax exemption pursuant to article 81, subsections 326(f), 326(gg) and 375(b) of the Maryland Code; and

III. Whether the circuit court's construction of sales and use tax exemptions violates the commerce clause of the United States Constitution.

## FACTS

UPS operates a common carrier service that picks up, transports and delivers small parcels, packages and freight throughout the continental United States. To carry out its service in the most efficient manner, appellant has devised an elaborate delivery system consisting of fifty-eight districts, the boundaries of which are roughly contiguous with state borders or large metropolitan areas. Within each district, appellant has established a network of package centers and "hubs", the latter of which are the major sorting centers that service the smaller package centers. The intricacies of UPS's delivery system were succinctly explained in the Tax Court's factual findings:

A typical package route, from origin to destination, would entail the following: a package is picked up by a delivery van at the shipper's address and carried to the assigned package center where it is sorted for further travel. If the package is to be delivered to a destination point within the area covered by that package center, it is delivered the next day to that point by delivery van. If the package is destined to a point outside the package

center area, it must then be routed to another package center before final delivery. This is accomplished through the use of tractor-trailers either by direct transfer from package center to package center, or the more likely situation, from package center to the centrally-located hub, the major sorting center which services a number of package centers. At the hub, the package is sorted and loaded onto tractor-trailers and then transported to the hub servicing the destination package center. From there, it goes to the proper package center and finally to the destination itself. The final leg of the package's journey is by way of delivery van.

As this description indicates, UPS relies on both tractor trailers and package delivery vans in conducting its business. The tractor trailers must obviously transverse state lines in the transportation of packages between hubs of different states. In contrast, the delivery vans never cross state lines. Their function is purely intrastate: the pick-up and delivery of packages within a limited geographic region inside state boundaries. The vans operating in the Maryland geographic area do so within the Maryland state lines. UPS does not dispute this fact.

Because the vans do not cross state lines and thus are not directly engaged in the interstate transportation of packages, the Comptroller has assessed sale and use taxes on UPS for the rental of delivery vans and the purchases of replacement parts and accessories for those vans. UPS objects to this assessment, contending that the vans are integral components of its nationwide interstate delivery service and are thus exempt from taxation pursuant to article 81, subsections 326(f), 326(gg) and 375(b) of the Maryland Code. In support of its position, UPS presents uncontroverted statistics indicating that over ninety percent of the freight handled by package delivery vans either originates within Maryland and is destined to points outside of Maryland or originates outside of Maryland and is destined to points inside Maryland. The Tax Court recognized the implications of this data: the vans, even though their

movement was purely intrastate, are an integral part of UPS's interstate operations, with nine out of ten packages that they handle being interstate cargo. As a result, the Tax Court ruled that UPS qualified for the interstate commerce exemption.

The Comptroller appealed this determination to the circuit court, which reversed and reinstated the Comptroller's tax assessments. On appeal to this Court, UPS asseverates that the circuit court's ruling should be overturned on three grounds. First, that the circuit court applied the incorrect standard of review. Second, the statutory provisions, subsections 326(f), 326(gg) and 375(b) of article 81 of the Maryland Code, entitle taxpayers such as UPS to the sales and use exemptions for intrastate vans that carry freight, ninety percent of which is being transported across state lines. And third, if the statute, as a matter of law, does not afford such an exemption, then this Court must hold the statutory provisions unconstitutional under the commerce clause. U.S. CONST. art. I, § 8, cl. 3.

Because the statutory issues are dispositive, we will not address the constitutional issue.

## I.

### *Standard of Review of Tax Court's Findings*

■ Article 81, section 229(*o* ) of the Maryland Code sets out the standard for reviewing the findings of the Tax Court:

> *Decision of circuit court.*—In any case, the circuit court for the county shall determine the matter upon the record made in the Maryland Tax Court. The circuit court shall affirm the Tax Court order if it is not erroneous as a matter of law and if it is supported by substantial evidence appearing in the record. In other cases, the circuit court may affirm, reverse, remand, or modify the order appealed from.

Under this standard, the nature of the findings reviewed determines the level of judicial scrutiny. Findings of fact

by the Tax Court receive greatest deference: a reviewing court may not reverse factual findings if they are supported by substantial evidence. *Ramsay, Scarlett & Company, Inc. v. Comptroller of the Treasury*, 302 Md. 825, 834, 490 A.2d 1296 (1985) (construing section 229 (*o*)). In contrast, no deference is accorded to a tax court's legal conclusions if a reviewing court finds them to be erroneous. *Ramsay, Scarlett*, 302 Md. at 834, 490 A.2d 1296; *Comptroller of the Treasury v. World Book Childcraft International, Inc.*, 67 Md.App. 424, 437, 508 A.2d 148 (1986). As to mixed questions of fact and law, an intermediate level of scrutiny applies: such findings must be affirmed if, after deferring to the Tax Court's expertise and to the presumption that the decision is correct, "a reasoning mind could reasonably have reached the [tax court's] conclusion." 302 Md. at 838, 490 A.2d 1296.

On two recent occasions, we have reviewed Tax Court decisions pursuant to section 229(*o* ) in light of the Court of Appeals gloss in *Ramsay, Scarlett. See World Book*, 67 Md. at 436–42, 508 A.2d 148; *Matthew Bender & Company, Inc. v. Comptroller of the Treasury*, 67 Md.App. 693, 703–12, 509 A.2d 702 (1986). To guide further the reviewing court in its evaluation of the Tax Court's findings, we formulated a methodology, a three-step analysis, that is consistent with and elaborative of the principles enunciated in *Ramsay, Scarlett:*

 1. First, the reviewing court must determine whether the agency recognized and applied the correct principles of law governing the case. The reviewing court is not constrained to affirm the agency where its order "is premised solely upon an erroneous conclusion of law."

 2. Once it is determined that the agency did not err in its determination or interpretation of the applicable law, the reviewing court next examines the agency's factual findings to determine if they are supported by substantial evidence, *i.e.*, by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* At this juncture, the *Ramsay, Scarlett* court reminds

us that "it is the agency's province to resolve conflicting evidence, and, where inconsistent inferences can be drawn from the same evidence, it is for the agency to draw the inference."

3. Finally, the reviewing court must examine how the agency applied the law to the facts. This, of course, is a judgmental process involving a mixed question of law and fact, and great deference must be accorded to the agency. The test of appellate review of this function is "whether, ... a reasoning mind could reasonably have reached the conclusion reached by the [agency], consistent with a proper application of the [controlling legal principles]".

*World Book*, 67 Md.App. at 438–39, 508 A.2d 148; *Matthew Bender*, 67 Md.App. at 705–06, 509 A.2d 702 (quoting *World Book* in full).

Implicit in this methodology is the requirement that the reviewing court must distinguish among the Tax Court's factual findings, legal conclusions, and applications of fact to law. Only when the reviewing court has accomplished this task, is the court capable of assessing the Tax Court's decision under the correct standard of review.

In the case *sub judice*, the controversy on appeal begins over this precise point: whether the circuit court, when reviewing the Tax Court decision, properly distinguished findings of fact, law, and those findings comprised of both. UPS argues that the Tax Court's conclusion that the package vans qualified for tax exemptions even though they never crossed state lines, was a mixed question of law and fact. Under *Ramsay, Scarlett, World Book*, and *Matthew Bender*, UPS insists that the circuit court failed to accord the Tax Court the "great deference" to which it is entitled under this standard of review. Strongly contesting this characterization, appellee asseverates that the Tax Court erroneously interpreted the meaning of particular words in the statute. Since questions of pure statutory construction are subject to broad judicial review, appellee concludes that the circuit court was "under no statutory constraints in reversing a Tax Court order which is premised solely upon

an erroneous conclusion of law." *Ramsay, Scarlett,* 302 Md. at 834, 490 A.2d 1296.

On this point, we agree with appellee that the Tax Court's decision ultimately involved the application of the law to the facts of the case, i.e. UPS's package vans that transport predominantly interstate cargo without crossing state lines fall within the purview of the statutory exemptions for sale and use taxes. The outcome of the case, however, turns on the court's legal conclusion as to the breadth of the exemption. The Tax Court construed it to be sufficiently broad so that it encompassed motor vehicles as being involved in interstate commerce which do not cross state lines, while the circuit court disagreed and construed the exemption to require vehicles to cross state lines before they qualified for the tax exemption. The legal conclusions that the Circuit Court and the Tax Court reached obviously determines the result of the case, i.e. a broad interpretation of the exemption relieves UPS from tax liability under the facts of the case, while a narrow interpretation does not.

This situation differs substantially from that in *Ramsay, Scarlett* and *World Book,* in which the reviewing court in each case accorded the Tax Court "great deference" and refused to overturn its decision if "a reasoning mind could have reached the [same] conclusion." *Ramsay, Scarlett,* 302 Md. at 835, 490 A.2d 1296. In *Ramsay, Scarlett,* the Tax Court had correctly outlined the correct legal tests to be applied. *Id.* at 837, 490 A.2d 1296. The resolution of the case hinged upon the proper application of that law to the facts of the case: i.e. whether *Ramsay, Scarlett's* operations in Maryland and Louisiana constituted a unitary business pursuant to what had already been correctly identified as the legal standard. Similarly, this Court in *World Book* reversed the Tax Court's conclusion that World Book's business activities in Maryland rose above the level of "mere solicitation" as defined by the federal statute. *World Book,* 67 Md.App. at 437–40, 508 A.2d 148. Since the resolution of the issue did not involve a reinterpretation

of the applicable law independent of the facts, we limited the scope of our review.

■ Accordingly, we hold that the circuit court had unlimited review of the Tax Court's legal conclusion that substantial involvement of UPS's vans in interstate commerce, without crossing state lines, is sufficient to qualify for the tax exemption.

In passing, we note that there is no dispute regarding the factual conclusions that the Tax Court reached. The record amply supports these findings and we will not disturb them.

## II.

### *Scope of Tax Exemptions*

■ Although the circuit court possessed unlimited power of review, this power was restricted only to *erroneous* legal conclusions. Obviously, if the statute is construed correctly, the reviewing court must let the Tax Court's legal conclusion stand. In the instant case, UPS argues that the Tax Court, and not the circuit court, apprehended the correct interpretation of the statute. In support of its position, appellee points to the plain language and legislative history of the statute and urges us to reinstate the Tax Court's decision. We agree and hold that the statute and relevant regulations clearly exempted UPS's package vans from the assessment of sales and use taxes.

### A.

### *Statutory Scheme*

The period for which UPS contests the Comptroller's assessment of sales and use taxes spans over three and one-half years, from January 1, 1977 to July 31, 1980. During this assessment period, a change in the law occurred which requires us to consider two applicable statutory provisions.

Between January 1, 1977 and June 30, 1977, the operative statutory provision was article 81, section 326(f) of the

Maryland Code which exempted from sales tax [1] "[s]ales which are not within the taxing power of this State under the Constitution of the United States." To provide substantive guidance as to the scope of this exemption, over 30 years ago the Comptroller adopted, as an interpretative regulation, Rule 64 which provided, in pertinent part:

> If goods are sold within this State, but possession is taken by the purchaser without the State the sales tax does not apply. Possession will be considered to be taken by the purchaser without this State if:

> (c) ... the taxable items are sold to a person regularly engaged in interstate or foreign commerce for incorporation into or use on or by their vehicles which transport or move either passengers or property across State lines or in foreign commerce. Sales of vehicles which will regularly transport passengers or property across State lines or in foreign commerce are also exempt.

Section 326(f) and the accompanying regulation were superceded when the General Assembly promulgated article 81, section 326(gg) of the Maryland Code, which became effective on July 1, 1977. Articulating with greater clarity and precision than section 326(f) the statutory limits of the sales tax exemption, section 326(gg) specifically excludes from taxation:

> Sales of aircraft, vessels, railroad rolling stock, and motor vehicles, which will be used principally in the movement of passengers or freight, or both, in interstate and foreign commerce, and sales of replacement parts and other tangible personal property to be used physically in, on, or by them.

After the enactment of section 326(gg), the Comptroller attempted to define further the parameters of the exemption through the adoption of Regulation .64-1 (COMAR

---

**1.** Article 81, subsection 375(b) of the Maryland Code renders the exemptions from sales tax contained in section 326 applicable to the use tax. As a result, references throughout this opinion to sales tax exemptions apply as well to the use tax.

03.06.01.64–1). Subsection D of this regulation explicitly required that vehicles must cross state lines in order to qualify for interstate commerce exemption:

> The exemption from taxation described in this regulation is limited to tangible personal property which will actually be taken across state borders. Tangible personal property which will not actually be taken across state borders is not exempt without regard to how closely related or necessary this property may be to the interstate activities of the purchaser.

In addition to this general requirement, the Comptroller articulated several tests for determining whether a motor vehicle is used principally in interstate commerce, each of which required the crossing of state lines.

### B.

### *Plain Language of the Statute*

The principal issue is the scope of the tax exemption as defined by section 326(f), and section 326(gg). UPS contends that the plain language of Rule 64 explicitly authorizes an exemption for motor vehicles engaged in the transport of interstate cargo but which do not cross state lines, while the plain language of section 326(gg) prohibits the Comptroller from imposing a line-crossing requirement under the Regulation .64–1. We will address the merits of each contention in order.

When engaged in statutory construction, it is well settled that not only should this Court begin its investigation with the words of the statute, but we are bound by those words if their import is clear and unambiguous:

> The statutory language itself provides the clearest indication of the legislative intent and is thus the primary source for all statutory construction. *Board v. Stephans* [286 Md. 384, 408 A.2d 1017 (1979)], *supra*. We also adhere to the principle that the court should confine itself to construing the statute according to the ordinary and natural signification of the words used without resorting

to subtle or forced interpretations designed to limit or extend the operation of the statute. *Harbor Island Marina v. Calvert Co.,* [286 Md. 303, 407 A.2d 738 (1979)], *supra; Mauzy v. Hornbeck,* 285 Md. 84, 400 A.2d 1091 (1979); *Massage Parlors, Inc. v. City of Balto.,* 284 Md. 490, 398 A.2d 52 (1979). When the words used convey a clear and plain meaning, there is no need to look beyond the statute to ascertain the legislative intent. *Collier v. Connolley,* 285 Md. 123, 400 A.2d 1107 (1979); *Mauzy v. Hornbeck, supra,* 285 Md. at 93 [400 A.2d 1091]; *Massage Parlors, Inc. v. City of Balto., supra,* 284 Md. at 494–95 [398 A.2d 53]. Stated differently, when the statute is free from ambiguity, the court may not disregard the natural impact of the words so as to make the statute express an intention which is different from its plain meaning.

*State v. Berry,* 287 Md. 491, 495–96, 413 A.2d 557 (1980); *accord Bledsoe v. Bledsoe,* 294 Md. 183, 189, 448 A.2d 353 (1982). *See also Messitte v. Colonial Mortgage Service Company Associates, Inc.,* 287 Md. 289, 293–94, 411 A.2d 1051 (1980) (stating that if regulation is unambiguous, it will be construed in accordance with its plain meaning). Since the same rules of statutory construction apply to the interpretation of regulations, *Messitte,* 287 Md. at 293, 411 A.2d 1051, first we examine the language of Rule 64 and section 326(gg) and then determine whether these provisions impose a line-crossing test.

█ Rule 64 exempts from sales tax "items ... sold to a person regularly engaged in interstate or foreign commerce for incorporation into or use on or by their vehicles which transport or move either *passengers or property across state lines* or in foreign commerce." (emphasis added). We conclude that its words do not impose any line-crossing requirement. The rule does not make any delineation in treatment between interstate carriers whose vehicles cross state borders and those whose vehicles do not cross state lines. Rather, the rule mandates that in order to qualify under the exemption, the passengers or freight must cross

state boundaries. The proper focus of the rule, therefore, is not whether the vehicles cross state borders, but whether there is movement of "passengers or property across state lines."

Breaking Rule 64 into its constituent parts, we therefore hold that Rule 64 requires first, the taxpayer must be "regularly engaged in interstate or foreign commerce," and second, that although the vehicles need not necessarily cross state lines, the movement of their passengers or freight must be interstate.[2]

Applying our construction of Rule 64 to the facts of the instant case, it is readily apparent that UPS qualifies for the exemption. It remains uncontroverted that UPS's package vans are an integral part of its nationwide delivery system, with ninety percent of the packages handled by these vans being interstate cargo. This movement of property across state lines places UPS's package vans within the ambit of Rule 64. Accordingly, we hold that the Tax Court concluded correctly that Rule 64 exempted appellant's package vans.

Our conclusion that the proper focus of Rule 64 is on the movement of property, and not vehicles, across state lines is confirmed by the legislature's subsequent promulgation of subsection 326(gg). Although subsection 326(gg) superceded subsection 326(f) and Rule 64, its purpose was not to change the breadth of the tax exemption. Even the Comptroller admits that the legislature's purpose in enacting subsection 326(gg) was simply to preserve and clarify the existing scope of the tax exemption under Rule 64. Examination of that language in subsection 326(gg), however,

---

2. Significantly, this construction of Rule 64 comports with the Comptroller's previous interpretation of the rule, which had been in existence for over thirty years. In his letter dated June 26, 1976 to the Senate Tax Reform Study Committee, the Comptroller explained that while "some states impose sales taxes on instate repairs and purchases by motor carriers operating in interstate commerce ... the State of Maryland cannot at this time impose a sales tax on such repairs and purchases because of our Rule 64."

clearly indicates that movement of passengers or property, and not vehicles, is the linchpin of the test for determining the scope of the exemption.

Subsection 326(gg) provides that a sales tax shall not apply to

... motor vehicles, which will be used principally in the movement of passengers or freight, or both, in interstate commerce and foreign commerce, and sales of replacement parts and other tangible personal property to be used physically in, on, or by them.

The plain language of this provision clearly articulates the scope of the exemption: motor vehicles are exempted if they are "used principally in *the movement of ... freight ...* in interstate or foreign commerce." On its face, the statute does not impose a line-crossing test: nowhere does the statute differentiate between interstate carriers whose vehicles cross state borders and those whose vehicles do not cross state lines. Instead, the clear and unambiguous language of the statute requires only that the vehicles. be "used principally in the movement of ... freight ... in interstate commerce." Reading these words literally, we hold their import to be that the freight, and not vehicles, must cross state lines. Pursuant to this subsection, the Comptroller however adopted Rule .64–1, which imposed a line-crossing test as a condition for qualifying for the sales tax exemption. In adopting this regulation, appellant argues the Comptroller exceeded his statutory authority and therefore the line-crossing requirement of Rule .64–1 should not be imposed. We agree.

 On review, this Court accords great deference to agencies' interpretations of their authorizing statutes. *Comptroller of the Treasury v. M.E. Rockhill, Inc.,* 205 Md. 226, 233, 107 A.2d 93 (1954); *McShain v. Comptroller of the Treasury,* 202 Md. 68, 95 A.2d 473 (1953). Such interpretations, however, are not binding upon the courts, especially when the interpretative regulation exceeds the authority of the authorizing statute. *Comptroller of the*

*Treasury v. The Mandel, Lee, Goldstein, Burch Re-Election Committee*, 280 Md. 575, 580, 374 A.2d 1130 (1977); *Rockhill*, 205 Md. at 233–34, 107 A.2d 43; *Magruder v. Hospelhorn*, 173 Md. 62, 72, 194 A. 839 (1937) (quoting *Gould v. Gould*, 245 U.S. 151, 153, 38 S.Ct. 53, 62 L.Ed. 211 (1917)). As the Court of Appeals emphasized in *The Macke Company v. Comptroller of the Treasury*, 302 Md. 18, 485 A.2d 254 (1984), the agency must follow and may not rewrite the statute:

> [T]he rule is firmly established that when statutory language is clear and unambiguous, administrative constructions, no matter how well entrenched, are not given weight. As Chief Judge Murphy reiterated for the Court in *St. Dept. of A. & T. v. Greyhound Comp.*, 271 Md. 575, 589 [320 A.2d 40] (1974), "the unvarying construction of a law by the agency charged with its enforcement over a long period of time ... cannot override the plain meaning of the statute or extend its provisions beyond the clear import of the language employed." Furthermore, if the administrative practice is illogical or inconsistent with the statute, it should not be followed.

*Macke*, 302 Md. at 22–23, 485 A.2d 254 (citations omitted). By imposing a line-crossing requirement, when section 326(gg) imposes a much broader requirement that motor vehicles must merely be "used principally in the movement of ... freight ... in interstate commerce," the Comptroller has overridden the plain meaning of the statute.[3] Accordingly, Regulation .64–1 should not be followed.

---

**3.** The Comptroller cites foreign case law in which courts have construed other state's authorizing statutes as permitting the imposition of line-crossing requirements. As the Tax Court correctly noted, the courts in those cases "were interpreting statutes with language different from that before us and different results would be expected." Although the cases have some precedential value, they certainly are not dispositive of the issue whether the language of section 326(gg), which differs significantly from those other statutes, authorizes the imposition of a line-crossing test. *See, United Parcel Service, Inc. v. State of Washington, Department of Revenue*, 102 Wash.2d 355, 687 P.2d 186 (1984) (statute providing tax exemptions for vans "used ...

## C.

### *Legislative History*

The Comptroller argues that the legislative history surrounding the enactment of section 326(gg) supports his position that the legislature intended to impose a line-crossing requirement. Resort to these documents, however, is unnecessary since the plain language is dispositive of the issue. *State v. Berry,* 287 Md. 491, 495–96, 413 A.2d 557 (1980); *Collier v. Connolley,* 285 Md. 123, 128–32, 400 A.2d 1107 (1979); *Mauzy v. Hornbeck,* 285 Md. 84, 93, 400 A.2d 1091 (1979); *Massage Parlors, Inc. v. City of Baltimore,* 284 Md. 490, 494–95, 398 A.2d 52 (1979).

Although the plain meaning of section 326(gg) adequately supports our conclusion, we note in passing that the extrinsic aids that the Comptroller adduced into evidence do not contradict or bring into question our interpretation of section 326(gg). In fact, we agree with the Tax Court that this supporting documentation paints a picture that the legislature intended section 326(gg) to preserve and clarify the exemption as delineated in old Rule 64. In its opinion, the Tax Court stated:

> Rule 64 exempted too many transactions according to the Comptroller. Included among those transactions were instate purchases and repairs by all interstate carriers. Never is there mentioned any delineation in treatment between interstate carriers whose vehicles cross state borders and those whose vehicles do not cross state lines. The Comptroller attempted to have the statutory exemption narrowed to include only large ships and vessels. If such an exemption were adopted, the shipping industry would remain exempt, but the Comptroller could then tax transactions made by interstate carriers and state revenues would significantly increase. However, the General Assembly refused to limit the exemption to one industry;

for transporting *therein* persons or property for hire across the boundaries of this state").

and, instead, adopted 326(gg) which simply had "the effect of preserving the tax exemption conferred upon interstate carriers by the Comptroller's Rule 64." ... This bill had no affect, one way or the other, on state revenues. The General Assembly, then, only statutorily enacted the broad exemptions as found in Rule 64, which contained *no* specific requirement that the property sought to be taxed cross state borders in order to qualify for the exemption.

The Comptroller nevertheless attempts to negate the statutory language and legislative history of section 326(gg) by focusing on the behavior of the legislature after its enactment. He points to the fact that the Joint Standing Committee on Administrative, Executive & Legislature Review (AELR) of the General Assembly is charged with the responsibility of agency regulations and making "any recommendation for legislative action necessary to modify, change or reverse any rule, regulation or standard which the Committee has considered." *D'Anna v. Secretary of Personnel*, 47 Md.App. 180, 183, 422 A.2d 50 (1980) (construing MD.ANN.CODE art. 40, § 40A(e) (1983) as recodified in MD. STATE GOVERNMENT CODE ANN. § 2–506 (1984)).

In the case *sub judice*, the AELR Committee had received proposed Regulation .64–1 from the Comptroller, but took no action. Appellant contends that this "absence of critical comment" created *sub silento* a "legal presumption ... that the regulation does not conflict" with the authorizing statute, subsection 326(gg). *D'Anna*, 47 Md. App. at 183, 422 A.2d 50. Reliance on *D'Anna* is no longer appropriate since, on March 4, 1983, less than two months after the Comptroller issued its initial opinion in this case, the General Assembly promulgated law that forbids such presumptions:

*Failure to comment on regulations.—*

The failure of the Committee to comment on or to object to a proposed or adopted regulation is not an indication that:

(1) the Committee approves the regulation;

(2) the statute under which the regulation is adopted authorizes the adoption; or

(3) the regulation conforms to the legislative intent of the statute.

MD. STATE GOVERNMENT CODE ANN. § 2–506(c) (1984). Because of the legislature's negative reaction to *D'Anna,* we hold that no inference concerning the validity of Regulation .64–1 may be drawn from the AELR Committee's silence.

JUDGMENT REVERSED;

COSTS TO BE PAID BY APPELLEE.