521 A.2d 785

COMPTROLLER OF the TREASURY, INCOME TAX DIVISION

v.

ARMCO, INC.

No. 744, Sept. Term, 1986.

Court of Special Appeals of Maryland.

March 5, 1987.

404

Gerald Langbaum, Asst. Atty. Gen., Annapolis (Stephen H. Sachs, Atty. Gen., Baltimore, and John K. Barry, Asst. Atty. Gen., Annapolis, on the brief), for appellant.

Harry D. Shapiro (Neil C. Kahn and Venable, Baetjer and Howard, on the brief), Baltimore, for appellee.

Argued before GILBERT, C.J., and ALPERT, and POLLITT, JJ.

POLLITT, Judge.

Constitutional questions concerning the State's power to tax have long occupied this country's courts. Chief Justice John Marshall declared almost 200 years ago that "The power to tax involves the power to destroy," in finding unconstitutional the efforts of the State of Maryland to tax a national bank.[1] In this appeal, we find the State's efforts to apply a tax exclusion to corporate subsidiaries engaged in the export of domestic goods must meet a similar fate, because the exclusion discriminates against corporations doing the majority of their business in other states, and thereby violates the Commerce Clause.[2] We also find that the State may constitutionally tax the interest income of a nondomiciliary corporation doing some business in this state, if that income is earned in the course of activities related to the corporation's business in Maryland.

Disturbed by this country's trade deficit, Congress gave special recognition to a corporate entity it described as a Domestic International Sales Corporation (DISC).[3] *Westinghouse Electric Corp. v. Tully*, 466 U.S. 388, 390, 104 S.Ct. 1856, 1858, 80 L.Ed.2d 388 (1984). DISCs are purely fictional subsidiary corporations that afford their U.S.-based parent tax incentives to increase their exports. These "fed-

---

**1.** *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819). Justice Holmes later responded that "The power to tax is not the power to destroy while this Court sits." *Panhandle Oil Co. v. Knox*, 277 U.S. 218, 223, 48 S.Ct. 451, 453, 72 L.Ed. 857 (1928). This difference of opinion stems from the two Justices' differing concepts of law, rather than any doubt as to the significance of the taxing power.

**2.** The Commerce Clause provides that "The Congress shall have Power ... To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes ...." U.S. Const. art. I, § 8, cl. 3.

**3.** DISCs no longer exist in the Internal Revenue Code as such. The Tax Reform Act of 1984 replaced them with entities called Foreign Sales Corporations. However, this case involves disputed tax assessments for 1978 while DISCs remained in effect. It should also be noted that the Commerce Clause principles we apply here are not inextricably intertwined with specific details intrinsic only to DISCs.

eral phantasms" have no assets, no property, and no personnel; they are hollow bookkeeping entities that serve to isolate export profits of a domestic enterprise. The profits so isolated are eligible for preferential tax treatment. Only a portion of this profit—the deemed dividend—is taxed currently to the parent company, the rest—the accumulated income—is not taxed to either the parent or the DISC until it is actually distributed to the parent (the shareholder), or until the DISC no longer exists.[4] As a result, under the federal tax scheme, no income is taxed to the DISC itself. The parent corporation is thus able to defer tax payment on a portion of its profits which would otherwise be immediately taxable. The parent can use the DISC's accumulated income for further export activities without losing the tax benefit.

Maryland uses a corporation's net income for federal tax purposes as its basis for computing that corporation's state tax liability. Maryland Code (1957, 1980 Repl.Vol., 1985 Supp.) Art. 81, § 280A(a). Maryland taxes only that portion of the federally determined net income that is allocable to the State, as that term is defined by § 316 of the Tax Code.[5]

We have previously commented that it is not surprising that state courts and legislatures were unprepared to deal with DISCs. *Ward Europa, Inc. v. Comptroller,* 66 Md.

---

**4.** This opinion recites only those aspects of DISCs relevant to an understanding of this case. For a more detailed analysis of DISCs and references to other sources, *see Westinghouse, supra,* and *Ward Europa, Inc. v. Comptroller,* 66 Md.App. 332, 503 A.2d 1371 (1986).

**5.** The Maryland tax laws allow a foreign corporation a number of exclusions to its federally determined net income, in determining its adjusted business income. The portion of a corporation's state taxable income that is allocated to Maryland is determined by multiplying the adjusted business income by a statutorily-prescribed apportionment factor. The product thus obtained is the corporation's net income allocable to Maryland, and is multiplied by the State's tax rate to determine the corporation's state tax liability. § 288. The apportionment factor is basically derived by averaging the percentage of a corporation's total property, payroll, and sales that are attributable to Maryland. For a detailed explanation of the application of this apportionment factor to DISCs, *see Ward Europa, supra.*

App. 332, 337, 503 A.2d 1371, 1373 (1986). This case is the result of the state legislature's attempt to tax DISCs and further Maryland's economic interests.

DISCs, because they are, technically speaking, distinct corporate entities, are subject to Maryland tax on their net income. *See* § 295 of the Tax Code. In the federal tax scheme this income, as previously noted, is tax-exempt with the exception of the portion that is "deemed" distributed to the parent. This deemed distribution is federally taxed once only, as part of the parent's income. In contrast, the Maryland tax scheme, until 1978, did not contain any special provision for DISCs. In the absence of any such provision DISCs with any net income allocable to Maryland faced the spectre of "double taxation" by the State. The State could tax the DISC's allocable income directly when the income was in the "hands" of the DISC, and then tax the allocable deemed distributed income a second time when the income was in the hands of the parent.

The General Assembly attempted to alleviate the burden of this double tax in 1978. Chapter 359 of the Laws of 1978 repealed and reenacted, with amendments, then Maryland Code (1957, 1975 Repl.Vol., 1977 Supp.) Art. 81, § 280A(c). The preamble to the Act states that its purpose is to tax

> dividends received by a Maryland corporation from the earnings of an affiliated subsidiary domestic international sales corporation [DISC] to the same extent as dividends received by Maryland corporation[s] from any other affiliated corporation.

The amended legislation seemingly accomplishes this purpose by providing for an exclusion of deemed income in the parent's taxable income. The first sentence of § 280A(c)(7) provides that:

> (c) There shall be subtracted from taxable income of the taxpayer the following items to the extent included in federal income: ... (7) to the extent that the dividends are included in taxable income, the percentage of dividends received from an affiliated domestic international

sales corporation [DISC] (as defined by Internal Revenue Code of 1954 § 992(a)), which is equivalent to the percentage that would be excluded if the domestic international sales corporation was not qualified under § 992(a).

The legislation that is constitutionally challenged here is the immediately following sentence of § 280A(c)(7) which limits the applicability of the deemed income exclusion.

However, this exclusion shall be available only if at least 50 percent of the net taxable income of the domestic international sales corporation is subject to Maryland taxation. . . .

Simply stated, the benefit of the tax exclusion is limited to those parent corporations whose DISCs have at least 50% of their net income allocable to the State. Those parent corporations whose DISCs do not meet the 50% standard do not qualify for the exclusion. Thus, a DISC doing over half its business in Maryland qualifies its parent for preferential treatment vis-a-vis a DISC doing less than half its business in Maryland.

Armco, Inc. (Armco) is the parent corporation and sole shareholder of Armco Export Sales Corporation (Armco Export), Armco's affiliated DISC. In 1978, Armco received from its DISC a deemed distribution of $17,643,847, representing that portion of the DISC's profits that federal law deemed distributed to its parent.[6] Armco included the deemed distribution in its federal taxable income, but excluded the distribution in determining its state taxable income. Upon audit, the Comptroller disagreed, and added back the deemed distribution to Armco's state taxable income. After applying the relevant allocation and tax percentage to the dividend, the Comptroller asserted deficiencies attributable to this exclusion in Armco's return of $23,499.

---

6. Under the federal statutory provisions in effect in 1978, 50% of a DISC's income was deemed distributed to its shareholders. In 1982, Congress increased from 50% to 57.5% the portion of DISC income deemed distributed to the DISC's shareholders.

Armco appealed this assessment to the Maryland Tax Court. Armco did not dispute that it did not qualify for the exclusion under § 280A(c)(7), which denies the exclusion to parents whose affiliated DISC's taxable income in Maryland is less than 50% of its federal taxable income. Armco and the Comptroller agreed that only 2% of Armco Export's net income was subject to Maryland tax.[7] Armco asked the Tax Court instead to declare that the limitation of the exclusion in § 280A(c)(7) violated the Commerce Clause of the U.S. Constitution.

The Tax Court declined to address this constitutional question declaring, *sua sponte*, that it lacked subject matter jurisdiction to declare part of a statute constitutionally invalid.[8] It therefore affirmed the assessment. Armco appealed this order of the Tax Court to the Circuit Court for Baltimore City, again challenging the constitutionality of the limitation of the exclusion before Judge Martin B. Greenfeld. Judge Greenfeld found the provision violated the Commerce Clause, deleted the offending sentence of § 280A(c)(7) and reversed the order of the Tax Court. The Comptroller appeals from that order, and we now affirm the judgment of Judge Greenfeld in that respect.

Armco also excluded from its 1978 taxable income $282,-570 in interest income generated by a loan to the Iron Ore Company of Canada (IOCC). Again taking issue with Arm-

---

7. The exact figure is 1.8975%. Since the DISC has no payroll, property, or sales in Maryland, its taxable income depends solely upon the extent of the parent's payroll, property and sales within Maryland.

8. In *Shell Oil Co. v. Supervisor,* 276 Md. 36, 343 A.2d 521 (1975), Judge Eldridge, writing for the Court of Appeals, declared that
   any attempt by the Legislature to impose judicial functions on the Maryland Tax Court would ... fail as violating the Article 8 [of the Maryland Constitution] separation of powers requirement as well as the limitation of Art. IV of the Constitution that only the courts there enumerated can exercise judicial power.
   276 Md. at 47, 343 A.2d at 527. That constitutional decisions represent the epitome of the judicial function is beyond dispute. For good or ill, Chief Justice Marshall settled the issue in *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), when he stated "This is of the very essence of judicial duty."

co, the Comptroller disallowed this exclusion and added back the interest income to Armco's state taxable income, resulting in the assessment of a deficiency against Armco. Armco also appealed this assessment to the Tax Court. At the Tax Court the Comptroller conceded that Armco and IOCC were not a unitary business. Armco also established that the loan was not made by its financial services subsidiary, but instead was handled as a general corporate transaction. The Tax Court reversed the Comptroller's assessment with respect to the interest from IOCC on the grounds that the activities of Armco and IOCC were not unitary. The Comptroller appealed the order of the Tax Court to the circuit court, where the circuit court reversed the Tax Court on this issue, reasoning that, because Armco operated a financial services subsidiary, the State could properly tax any interest Armco received from its loan to IOCC. From the order of the circuit court reversing the Tax Court, Armco cross-appeals. We find that due process principles as enunciated by the U.S. Supreme Court require the interest income at issue to be related to Armco's business in this State. Because the evidence contained in the record before us is inconclusive on this issue, we vacate the order of the circuit court and remand for further fact-finding.[9]

We address first the Commerce Clause question.

## I

The Supreme Court has acknowledged that the adjustment of state taxation within the confines of the Commerce Clause is a delicate one, leaving little in the way of precise guides to the States. Nevertheless, "From the quagmire there emerge ... some firm peaks of decision which remain unquestioned.... No State may ... 'impose a tax which discriminates against interstate commerce ... by providing a direct commercial advantage to local business.' " *Boston Stock Exchange v. State Tax Comm'n*, 429 U.S. 318, 329,

---

9. Armco appealed a total of nine different assessments to the Tax Court; at the time of the circuit court proceedings only three issues remained; as this case reaches us, only two issues remain.

97 S.Ct. 599, 607, 50 L.Ed.2d 514 (1977), *quoting Northwestern States Portland Cement Co. v. Minnesota,* 358 U.S. 450, 457, 79 S.Ct. 357, 361, 3 L.Ed.2d 421 (1959). This cardinal rule of Commerce Clause construction is grounded in elementary economic principles. The Commerce Clause is designed to protect free trade. The concept of free trade is ill-served by the "multiplication of preferential trade areas" that would result if individual states enacted laws granting economic benefits to in-state businesses at the expense of out-of-state businesses. *Boston Stock* 429 U.S. at 329, 97 S.Ct. at 607.

■ The Supreme Court has considered the constitutionality of a myriad of state taxes in the last ten years. The Court has taken pains to note that the states are free to structure their tax systems to encourage the growth and development of intrastate commerce and industry, and are free to compete with one another. *Id.* at 337, 97 S.Ct. at 610. Nor is a state tax *per se* invalid because it burdens interstate commerce. Interstate commerce may constitutionally be made to pay its way. *Maryland v. Louisiana,* 451 U.S. 725, 754, 101 S.Ct. 2114, 2133, 68 L.Ed.2d 576 (1981). In the process of this competition, however, no state may *discriminatorily* tax the products manufactured or the business operations performed in any other State. *Boston Stock* 429 U.S. at 337, 97 S.Ct. at 610 (emphasis added).[10]

■ Stripped of all the verbiage with which the Comptroller clothes it, the issue in this case is simply one of discrimination. Section 280A(c)(7) discriminates against parent corporations who conduct less than 50% of their business in Maryland by denying them the same tax exclusion permit-

---

**10.** The Court has instituted a four-part test to determine the validity of a state tax for Commerce Clause purposes. No state tax may be sustained unless the tax: (1) has a substantial nexus with the State; (2) is fairly apportioned; (3) does not discriminate against interstate commerce; and (4) is fairly related to the services provided by the State. *Maryland v. Louisiana,* 451 U.S. at 754, 101 S.Ct. at 2133. Here we deal only with the issue of discrimination.

ted corporations who conduct 50% or more of their business in Maryland. The language "subject to Maryland tax" in the exclusion refers to Maryland's apportionment formula, which is specifically designed to measure the percentage of business a corporation conducts in Maryland. A parent corporation conducting 50% of its business in Maryland *will not* be taxed on any of the income deemed distributed from its DISC. A parent corporation conducting less than 50% of its business in Maryland *will be* taxed on the allocable portion of the income deemed distributed from its DISC. The former corporation therefore enjoys a tax benefit denied the latter corporation, solely because of the former's greater business ties to this State. Because the tax exclusion impermissibly discriminates on the basis of location of a corporation's business, it is unconstitutional.

The Comptroller defends the exclusion as a legitimate attempt by the legislature to exempt income from taxation when a risk of double taxation exists.[11] The Legislature, according to the Comptroller, "merely provided that if double taxation by Maryland approaches a certain level, that double tax is removed."

This argument serves only to obscure the issue. A corporation with 49% of its income allocable to Maryland will always be forced to pay a double tax under § 280A(c)(7) as presently constituted no matter how great its deemed dividend. In contrast, a corporation with 50% of its income allocable to Maryland will never pay a double tax, because the parent can exclude the dividend from its taxable income. While the Legislature may certainly decide what to exclude from taxable income, it may not limit that exclusion to Maryland businesses only.

---

11. Armco did not actually endure a "double tax," because its DISC paid no corporate income tax. This in no way affects its standing to assert the unconstitutionality of § 280A(c)(7), as the statute still denied Armco the tax benefit enjoyed by a more closely State-connected corporation. There would have been no constitutional bar to taxing Armco's DISC, however, as all DISCs face the same tax consequences regardless of how much of their income is subject to Maryland tax.

The Comptroller disputes this, implying that Maryland may enact tax criteria differentiating between corporations on the basis of "the amount of business done by the taxable entity in the taxing state." The Comptroller seeks to find support for this in both *Westinghouse* and *Ward Europa.* In *Ward Europa,* we held that a DISC's apportionment formula may be based on the property and payroll factors of the parent corporation. From this holding, the Comptroller somehow deduces that a tax exclusion may be conferred or withdrawn on the basis of "a properly constructed apportionment formula." In *Westinghouse,* the Supreme Court considered a New York state tax credit issued to parent corporations which had the effect of lowering the tax rate on their affiliated DISCs. The Court invalidated the credit because the credit was based on the percentage of the parent's total exports that were shipped from New York. The Comptroller asserts that the Court's holding in *Westinghouse* was limited only to statutes discriminating on the basis of place of export, and does not apply to statutes discriminating on the basis of Maryland's apportionment formula.

As Judge Greenfeld observed in his memorandum opinion and order, this is truly a distinction without a difference. It is similar to the argument made by the Tax Commissioner in *Westinghouse,* and we simply adopt the Court's language in its wholesale rejection of the Tax Commissioner's argument.

The Tax Commission's argument that New York employs a constitutionally acceptable allocation formula, in our view, serves only to obscure the issue in this case. The acceptability of the allocation formula employed by the State of New York is not relevant to the question before us. The fact that New York is attempting to tax only a fairly apportioned percentage of a DISC's accumulated income does not insulate from constitutional challenge the State's method of allowing the DISC export credit. New York's apportionment procedure determines

what portion of a business' income is within the jurisdiction of New York. Nothing about the apportionment process releases the State from the constitutional restraints that limit the way in which it exercises its taxing power over the income within its jurisdiction.

Here, Westinghouse argues that the State of New York has sought to exercise its taxing power over accumulated DISC income in a manner that offends the Commerce Clause and the Equal Protection Clause of the Fourteenth Amendment. This challenge is not foreclosed by our holding that New York's allocation of DISC income is constitutionally acceptable. See 459 US 1144, 74 L Ed 2d 991, 103 S Ct 784 (1983) (dismissing for want of a substantial federal question Westinghouse's challenge to method of allocating DISC income to parent). "Fairly apportioned" and "nondiscriminatory" are not synonymous terms. It is to the question whether the method of allowing the credit is discriminatory in a manner that violates the Commerce Clause that we now turn.

The Court went on to emphasize that it is the effect a tax exerts on interstate commerce, rather than the particular means of achieving that effect, that is the focus of inquiry.

Whether the discriminatory tax diverts new business into the State or merely prevents current business from being diverted elsewhere, it is still a discriminatory tax that "forecloses tax-neutral decisions and ... creates ... an advantage" for firms operating in New York by placing "a discriminatory burden on commerce to its sister States."

Further demonstration of the irrelevancy of the Comptroller's position is provided in both *Armco v. Hardesty*, 467 U.S. 638, 104 S.Ct. 2620, 81 L.Ed.2d 540 (1984), and *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984).

## II

■ Having determined that the limitation § 280A(c)(7) imposes on the deemed dividend exclusion unconstitutional-

ly discriminates against interstate commerce, we must further determine whether to invalidate the entire provision providing for the exclusion or to sever the constitutionally infirm limitation. The established rule of construction in such situations requires us to determine whether the Legislature would have enacted the exclusion if it knew the limitation was invalid. *Sanza v. Maryland State Board of Censors*, 245 Md. 319, 338, 226 A.2d 317, 327 (1967).

In determining the legislative intent in this regard the Court of Appeals has directed us to presume that the Legislature generally intended its enactments to be severed if possible. *Ocean City Taxpayers v. Mayor & City Council*, 280 Md. 585, 600, 375 A.2d 541, 550 (1977). In the earlier case of *Davidson v. Miller*, 276 Md. 54, 83, 344 A.2d 422, 439 (1975), the Court stated the principle in more imperative terms:

> Likewise we mention that even though constitutional and unconstitutional provisions of a law are contained in the same section, the entire section or enactment is not invalid unless the provisions are essentially and inseparably connected in substance.... It thus becomes the duty of the court whenever possible to separate the valid from the invalid provisions....

*Cities Service v. Governor*, 290 Md. 553, 431 A.2d 663 (1981), tempers this declaration by noting that when a statute contains both a general provision and an invalid exception, "courts have often refused to sever when the severed statute would impose a duty, sanction or substantial hardship on the otherwise excepted class." 290 Md. at 576, 431 A.2d at 676. The desired goal is to avoid imposing a duty, sanction or substantial hardship on members of a class which the Legislature intended to exempt. *Id.* Thus, in *Burning Tree Club v. Bainum*, 305 Md. 53, 501 A.2d 817 (1985), the Court refused to sever "where the invalid portion of a statute is an exception to a prohibition, ... and severing would enlarge that prohibition beyond its reach as enacted." 305 Md. at 82, 501 A.2d at 831.

■ Applying these principles to this case compels us to sever the constitutionally infirm limitation from the provision granting the benefit of the exclusion to parent corporations of DISCs. The provision provides a benefit to all parents of DISCs, while the unconstitutional limitation denies the benefit to those parents without the required ties to the State. Striking the entire provision would deny a tax benefit to all parent corporations, while severance extends this benefit to all parents, regardless of their state taxable income.

This conclusion is reinforced by the preamble to Chapter 359 of the Laws of 1978, which declared that the amendment's purpose was to insure that dividends received from DISCs were taxed to the same extent as dividends received from any other affiliated corporation. Even the Comptroller argues that the Legislature enacted § 280A(c)(7) as a "reasonable response to the spectre of double taxation." Severance preserves this response. The last sentence of § 280A(c)(7) is therefore deleted, with the effect that dividends received by a parent corporation from any DISC are excluded from the parent's state taxable income, regardless of the percentage of the DISC's income subject to Maryland tax.

### III

Armco also challenges the Comptroller's refusal to exclude from taxable income interest payments received on a loan made to IOCC.[12] This challenge is premised on due process grounds.

Armco, at one time a small steel company, has now expanded to several lines of business including oil and gas drilling rigs, fabricated metal products, industrial products and services, financial services, and material resources.

---

**12.** As explained earlier, Maryland applies its tax to only the fraction of a corporation's net income that is allocable to this State. Armco asserts that none of the interest income at issue may be allocated to Maryland.

Armco is incorporated in Ohio, where it also maintains its corporate headquarters. Armco's business in Maryland consists of the production of specialty steel products in a Baltimore plant. As previously noted, approximately 2% of Armco's total business activities are conducted in Maryland.

In order for Maryland to tax Armco's income without violating principles of due process, there must exist a " 'minimal connection' or 'nexus' between the interstate activities [of Armco] and the taxing State [Maryland], and 'a rational relationship between the income attributed to the State and the intrastate values of the enterprise.' " *Container Corp. v. Franchise Tax Board*, 463 U.S. 159, 166, 103 S.Ct. 2933, 2940, 77 L.Ed.2d 545 *reh. den.*, 464 U.S. 909, 104 S.Ct. 265, 78 L.Ed.2d 248 (1983), *quoting Mobil Oil Corp. v. Commissioner of Taxes*, 445 U.S. 425, 436, 100 S.Ct. 1223, 1231, 63 L.Ed.2d 510 (1980). *See also Xerox Corp. v. Comptroller of Treasury*, 290 Md. 126, 428 A.2d 1208 (1981).

■ However, the constitutionality of the State tax is presumed, and the taxpayer has the distinct burden of showing by clear and cogent evidence that the State tax results in extraterritorial [and hence unconstitutional] values being taxed. *Container Corp., supra*, 463 U.S. at 165, 103 S.Ct. at 2940; *Exxon Corp. v. Wisconsin Dept. of Revenue*, 447 U.S. 207, 221, 100 S.Ct. 2109, 2119, 65 L.Ed.2d 66 (1980); *Xerox Corp.*, 290 Md. at 139, 428 A.2d at 1215.

In this case, Armco has proven that Armco and IOCC, the interest payor, are not unitary. According to Armco our inquiry need progress no further than this, because "the lack of unitariness between the payor and recipient of income, be it interest or dividend income, precludes apportionment of said income by the nondomiciliary state." Armco cites as support for this argument *ASARCO v. Idaho State Tax Commission*, 458 U.S. 307, 102 S.Ct. 3103, 73 L.Ed.2d 787 (1982), and urges us to adopt the rule that "due process does not permit Maryland to apportion the income derived from the mere investment in a non-unitary corpora-

tion." Having been referred to no specific language to this effect in *ASARCO* by Armco, and finding none ourselves, we must resist Armco's urgings.

Curiously, even the Comptroller implicitly concedes that the lack of unitariness between the payor and the taxpayer, as to dividend income, precludes the State from taxing the income *per se.* We think the Comptroller may be conceding too much.

*ASARCO* involved the attempt by the State of Idaho to tax dividend, interest, and capital gains income received by ASARCO from what the Supreme Court determined, over Idaho's objection, to be non-unitary affiliates. ASARCO, a mining corporation, received this income from corporations engaged in business at least relating generally to mining. The "undisputed facts" indicated these investments by AS-ARCO were "not integral to nor a necessary part of ASAR-CO's business operation," that ASARCO "has never been required to utilize its stock as security for borrowing of working capital, acquiring stock or securities in other companies or to support any bond issues," and that ASARCO had "sufficient cash flow from mining to provide operating capital for all mining operations without reliance upon cash flow from ... income from intangibles." *ASARCO* 458 U.S. at 325 n. 21, 102 S.Ct. at 3113 n. 21. Based on these facts Idaho could only premise its power to tax ASARCO's income from these investments on the theory that ASARCO and its affiliates at issue were a unitary business. The Court recognized that, in accordance with well established principles, Idaho's taxation of the disputed income would not contravene constitutional limitations "as long as the intrastate and extrastate activities formed part of a *single unitary business.*" *ASARCO* at 316, 102 S.Ct. 3109, *quoting Mobil Oil, supra,* 445 U.S. at 438, 100 S.Ct. at 1232 (emphasis in *ASARCO* ). Unfortunately for Idaho, the Court, through Justice Powell, found that ASARCO and the companies providing the income were not unitary. As a result of this finding and the undisputed facts just mentioned, Idaho's attempt to tax this income was unconstitu-

tional. Nowhere in *ASARCO* or the cases it cites does the Court intimate that the lack of unitariness between a taxpayer and payor corporation *per se* precludes the State from taxing any income the taxpayer receives from the payor.

■ The State's taxing power may be validly premised upon a finding of unitariness between the taxpayer's activities within the State and the taxpayer's activities generating the income received from without the State. Armco concedes this much by declining to contest "Maryland's right to treat interest received by Armco Financial Corporation as part of Armco's apportionable income derived in the ordinary course of its business." Armco makes no contention that all the recipients of loans made through Armco Financial Corporation are unitary with Armco, yet concedes Maryland's ability to tax income so earned, presumably on the theory that Armco Financial Corporation (located outside of Maryland) is unitary with Armco's activities in Maryland.

Justice Brennan, writing for the Court in *Container Corp.*, wrote:

A final point that needs to be made about the unitary business concept is that it is not, so to speak, unitary: there are variations on the theme, and any number of them are logically consistent with the underlying principles motivating the approach.

*Id.* 463 U.S. at 167, 103 S.Ct. 2941. As the Court emphasized in *Mobil*, the "economic realities" of an enterprise dictate the apportionability of income the parent receives. *Mobil* 445 U.S. at 441, 100 S.Ct. at 1233.

Further, we find no support in any authority cited us by the Comptroller for his proposition that dividend income and interest income constitutionally require different treatment for tax purposes. In fact, *ASARCO* explicitly contradicts this proposition.

Idaho and ASARCO agree that interest and capital gains income derived from these companies should be

treated in the same manner as the dividend income....
We also agree. "One must look principally at the underlying activity, not at the form of investment, to determine the propriety of apportionability." *Mobil*, 445 U.S., at 440 [100 S.Ct. at 1233]. Changing the form of the income "works no change in the underlying economic realities of [whether] a unitary business [exists], and accordingly it ought not to affect the apportionability of income the parent receives." *Id.*, at 441 [100 S.Ct. at 1233]. We therefore hold that Idaho's attempt to tax this income also violated the Due Process Clause.

*Id.* 458 U.S. at 330, 102 S.Ct. at 3116. The Comptroller seeks to explain away this language by noting that only Idaho's adoption of the "Uniform Division of Income for Tax Purposes Act" (UDITPA) required the Court to treat interest income and dividend income similarly. We think the quoted language demonstrates that the Court's similar treatment of dividend and interest income rests on constitutional interpretation and underlying economic realities, rather than language contained in Idaho's statutory law.

The Comptroller supports his interpretation of *ASARCO* by reference to *Silent Hoist and Crane v. Tax Div. Director*, 100 N.J. 1, 494 A.2d 775 (1985), which purportedly notes that "as a constitutional prerequisite for the taxation of dividends, a showing of unitariness between the payor and the recipient/payee" is required. Without the benefit of citation to specific language in that opinion, we undertake our own analysis of it. As does *ASARCO*, the Comptroller's citation to *Silent Hoist* contradicts his position. In dicta, the *Silent Hoist* court noted that:

Those decisions [*ASARCO* and *F.W. Woolworth Co. v. Taxation and Revenue Dep't of New Mexico*, 458 U.S. 354 [102 S.Ct. 3128, 73 L.Ed.2d 819] (1982)] reflected an attitude of judicial vigilance and "at least by implication cast doubt on the power of a state to include in a non-domiciliary payee's apportionable tax base any income from intangibles received from an out-of-state payor with which the payee is not conducting a unitary busi-

ness."   W. Hellerstein, "State Income Taxation of Multi-jurisdictional Corporations, Part II: Reflections on *AS-ARCO* and *Woolworth*," 81 Mich.L.Rev. 157, 178–79 (1982).   Only the cautious would have observed that it was "not, however, the only reading it may be given, a fact that may render the preceding discussion more than academic."   *Id.* at 182.

*Silent Hoist,* 494 A.2d at 788.   We, evidently, are "the cautious" as we interpret *ASARCO* as not limiting the State's power to tax intangibles to situations where the payor and payee are conducting a unitary business.   The decision in *Container Corp., supra,* however, only reinforces our interpretation of *ASARCO,* according to the *Silent Hoist* court.   The *Silent Hoist* court opined, "the *Container* decision implies that the Court's holdings in *Woolworth* and *ASARCO* can be confined to their specific facts." *Silent Hoist,* 494 A.2d at 788.[13]   *Silent Hoist* therefore offers no support, and in fact contradicts, the Comptroller's position that dividend income and interest income should be accorded different treatment.

The Comptroller also refers us to *Xerox, supra,* as support for his position.   We note preliminarily that *Xerox,* unlike *Silent Hoist,* pre-dates *ASARCO.*   In *Xerox,* the Court of Appeals upheld the State's power to tax royalty and interest income Xerox received from licensing fees and loans made to foreign subsidiaries.   As Armco claims here, Xerox asserted that "the royalty and interest income was derived from sources totally separate and distinct from its copier business and other active business operations in which it was engaged;   that the income was thus not a part of the unitary business which it conducted in Maryland," and that the State could not therefore constitutionally tax this income.   In rejecting Xerox's argument that the income received was not a part of Xerox's unitary business con-

---

**13.** Relying on our interpretation of *ASARCO,* we see no need to discuss *Woolworth* or *Container Corp.* in detail.   We note also that neither party to this appeal discussed those cases.

ducted in Maryland, the Court referred to numerous definitions of unitary business proposed by other states and then applied them to Xerox's business activities. Xerox contended that *Mobil, supra,* required the Court to limit its unitary business analysis to the question of whether the payor of the income was unitary with Xerox. The Court, in dicta, distinguished *Mobil* on the basis that it involved dividend, rather than interest, income, but did not reach the question of whether a unitary business determination would be affected by the form of the income in question. In light of existing confusion on this issue,[14] we have attempted to demonstrate that the U.S. Supreme Court has consistently applied an analysis keyed to "economic realities," and that neither logic nor Supreme Court precedent provides a constitutional basis for determining unitariness on superficial classifications of income. *ASARCO* and *Container Corp.* remove any doubt about the issue.

■ We now return to the question of whether Armco has met its burden of proof that the interest income it received from IOCC was unrelated to its unitary business operations in Maryland. Armco implicitly concedes that its financial division, located outside Maryland, and its steel operation, operating in its Baltimore plant, are unitary. The circuit court apparently based its finding that Armco's loan to IOCC (on which Armco received the interest) and Armco's business in Maryland were indeed unitary on the existence of a financial resources division within Armco. However, Armco asserts that the financial resources division had nothing to do with this loan, and characterizes the loan as an "extraordinary isolated transaction." While Armco had

---

**14.** The circuit court implied that the form of the income warranted distinguishing between the analyses to apply; and the Tax Court, while correctly refusing to distinguish on the basis of mere form, restricted itself to an analysis requiring the payor's business and the taxpayer's business to be unitary before the State could tax income the taxpayer received from the payor. Therefore both courts erred. Since the Tax Court's order as to dividend payments received by Armco is not appealed, we express no opinion as to it.

the burden of proof and both sides presented some evidence on this issue before the Tax Court, even the Comptroller admits that "The Tax Court never examined whether the interest income was earned as a part of Armco's unitary business." Yet this is the essential determination to be made in this case. In the absence of such a finding by the Tax Court, and in light of the circuit court's characterization of the evidence on this issue as "sparse," we decline to engage in fact-finding based on the record before us.

We recognize that a factual determination on this issue will involve the application of legal principles. There exist, however, inconsistent inferences that may be drawn from the evidence already adduced.

At this juncture, the *Ramsay Scarlett* [302 Md. 825, 490 A.2d 1296] court reminds us that "it is the agency's province to resolve conflicting evidence, and, where inconsistent inferences can be drawn from the same evidence, it is for the agency to draw the inference."

*Pinder v. Dean*, 70 Md.App. 252, 520 A.2d 1119 (1987), *quoting Comptroller of the Treasury v. World Book Childcraft International, Inc.*, 67 Md.App. 424, 438, 508 A.2d 148 (1986).

As guidance to the Tax Court, we note that the legal tests to be applied are clearly established in *Ramsey, Scarlett, supra,* and *Xerox.* The error below lay in not applying the test to the proper entity. Rather than applying the test to IOCC, which neither party asserts is unitary with Armco, the Tax Court should apply the test to that portion of Armco's business actually responsible for the loan to and interest received from IOCC. If application of the test indicates that this portion of Armco's business is not unitary with Armco's business in Maryland, then Armco may provide for this income with separate accounting. Keeping in mind that Armco bears the burden of proof on this issue, Armco must establish by "clear and cogent evidence" the assertions it makes to us; namely, that this loan, far from

relating to Armco's ordinary course of business in Maryland, is actually an "extraordinary isolated transaction." [15]

We therefore vacate the order of the circuit court on this issue and remand to that court with directions to remand to the Tax Court for a finding of whether Armco's business activity in generating this particular loan is unitary with Armco's business in Maryland.

JUDGMENT AFFIRMED IN PART AND VACATED IN PART; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY WITH DIRECTIONS TO REMAND TO THE MARYLAND TAX COURT FOR PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID ONE-FOURTH BY ARMCO, INC., AND THREE-FOURTHS BY THE COMPTROLLER OF THE TREASURY.

---

15. In this regard, the following colloquy took place at the Tax Court during cross-examination of Patrick Rossi, chief financial officer of Mineral Resource Division of Armco, Inc.:

Q. Legal people and treasury people would handle the loans as they handle any other legal or financial matters of the corporation, is that correct?

A. Or any other loan. I mean if we loan somebody money, it's like anything else.

Q. Well ...

A. I mean we are in the business of being ...

Q. I'm sorry, continue.

A. I was going to say we're in the business of ... I mean one of our divisions, we're in the business of loaning money.

Q. Okay. Well, I guess that's really what I'm getting to. If we look at the annual report, Respondent's Exhibit 1, we see that there are seven divisions ... this is stated in the president's letter, there are seven divisions of Armco, is that right?

A. Yes. Again, this wouldn't fall under the financial services group though. This is just a corporate transaction.

Q. Okay. It's handled as a general corporate transaction, the way all general corporate transactions are handled. If a lease might be handled in the legal department, a loan would be handled in the legal department; correct?

A. Yeah.

Q. This is no different then than what takes place in the ordinary course of the business of Armco, is that right?

A. Yes.