524 A.2d 93

**COMPTROLLER OF the TREASURY, INCOME TAX DIVISION**

v.

**NCR CORPORATION.**

No. 1132, Sept. Term, 1986.

Court of Special Appeals of Maryland.

April 16, 1987.

Certiorari Granted Aug. 3, 1987.

Gerald Langbaum, Asst. Atty. Gen., Annapolis (Stephen H. Sachs, Former Atty. Gen., J. Joseph Curran, Jr., Atty. Gen., Baltimore, and John K. Barry, Asst. Atty. Gen., Annapolis, on the brief), for appellant.

E. Stephen Derby (Karen L. Myers Zauner and Piper & Marbury, on the brief), Baltimore, for appellee.

Argued before GILBERT, C.J., and BISHOP and KARWACKI, JJ.

BISHOP, Judge.

This case involves a dispute between appellant Comptroller of the Treasury (Comptroller) and appellee NCR Corpo-

ration (NCR) over the assessment of Maryland corporate income taxes. The controversy began in 1976, when the Comptroller assessed NCR with additional Maryland corporate income taxes for the years 1972 through 1974 in the total amount of $30,315.00 plus interest. In 1980, the Comptroller again assessed NCR with additional Maryland corporate income taxes for the years 1975 through 1977, this time totalling $144,116.00 plus interest. NCR appealed both assessments to the Tax Court, which affirmed in part and reversed in part.

From the Tax Court's decision, both parties appealed to the Circuit Court for Baltimore City, each contesting the particular aspects of the decision that were adverse to its interest. In a lengthy opinion and order, the circuit court upheld the Comptroller's right to tax NCR's royalty income and the dividend income that it received from its foreign subsidiaries in 1976 and 1977, but also held that NCR's domestic placement interest income was not taxable; that NCR's gross-up income for the year 1976 was not taxable; and that NCR was entitled to modification in its sales, payroll and property factors to reflect worldwide the factors which produced its royalty and foreign subsidiary dividends. As to the last matter, the circuit court remanded the case to the Tax Court to obtain the necessary evidence to make the appropriate modifications to NCR's apportionment formula.

From the circuit court's judgments, the Comptroller appealed to this Court and NCR filed a cross-appeal. NCR, however, has since decided not to pursue its appeal, so the only issues remaining are whether the circuit court erred when it ruled that:

I. NCR may exclude gross-up for 1976 from its adjusted business income;

II. NCR may exclude its domestic placement interest income from its adjusted business income; and

III. If NCR's foreign income is subject to formula apportionment by Maryland, then its sales, payroll and proper-

ty factors should be adjusted to reflect worldwide the factors that produced this income.

## I.

### Background

### A.

### Statutory Scheme

■ Maryland taxes, on an apportioned basis, the entire net income of a multijurisdictional corporation, which is generated by interstate as well as intrastate activities. MD.ANN.CODE art. 81, §§ 280A, 316(c) (1980). Such taxation on interstate activities is constitutional, if fairly apportioned. *Mobil Oil Corporation v. Commissioner of Taxes,* 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980); *Northwestern States Portland Cement Company v. Minnesota,* 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959). In apportioning the business income of a multijurisdictional corporation, the first step is to determine that corporation's federal taxable income. MD.ANN.CODE art. 81, § 280A(a) (1980) (defining net income of a corporation as "the taxable income of such taxpayer as defined in the laws of the United States") Once the federal taxable income has been ascertained, subsections (b) and (c) of article 81, section 280A of the Maryland Code require further additions and subtractions. At the time relevant to this case, the statute permitted the following subtractions from a corporation's taxable income:

> There shall be subtracted from taxable income of the taxpayer the following items to the extent included in federal income: (1) operating revenue subject to gross receipts taxes imposed by this article (less related expenses) of railroads, other public utilities and contract carriers; (2) the amount of any refunds of income taxes paid to the State of Maryland, any other state, the District of Columbia, and any political subdivision of the State of Maryland and any other state; and (3) interest

income on obligations of the United States and its instrumentalities.

MD.CODE ANN. art. 81, § 280A (1975).

Although not pertinent to the instant case, additional adjustments for income from real or tangible personal property and for capital gains and losses are to be made to federal taxable income pursuant to article 81, section 316(a) and (b) of the Maryland Code.

If the corporation conducts its business solely within the jurisdiction of Maryland, the calculation stops at this point. The figure ascertained from the above computations represents the net business income on which an annual tax of seven percent is levied. *Id.* §§ 288(b) and (c), 316(c). If, however, the corporation is multijurisdictional, in that

the trade or business of the corporation is carried on partly within and partly without this State....

then an additional calculation becomes necessary:

So much of the business income of the corporation as is derived from or reasonably attributable to the trade or business of the corporation carried on within this State, shall be allocated to this State and any balance of the business income shall be allocated outside this State.

*Id.* § 316(c). To determine the allocable business income to Maryland, the statute provides the Comptroller with two alternate methods: "separate accounting" or "the three-factor formula of property, payroll and sales." *Id.*

The circumstances under which separate accounting is appropriate are limited: the corporation may employ this method, "where practicable, but never in the case of a unitary business." *Id.* When separate accounting is neither permissable nor practicable, the statute details a formula upon which the corporation must determine the proper allocation of income:

... where separate accounting is neither allowable nor practicable the portion of the business income of the corporation allowable to this State shall be determined in accordance with a three-factor formula of property, payroll and sales, in which each factor shall be given equal

weight and in which the property factor shall include rented as well as owned property and tangible personal property having a permanent situs within this State and used in the trade or business shall be included as well as real property.

*Id.* In *Xerox Corporation v. Comptroller of the Treasury,* 290 Md. 126, 428 A.2d 1208 (1980), the Court of Appeals explained this apportionment formula as follows:

> . . . a corporation must compute its Maryland tax liability by using a three-factor (sales, property and payroll) apportionment formula, each "factor" being a fraction. The numerator of the sales factor, for example, is the amount of a corporation's in-state sales; the denominator of the sales factor is the total amount of a corporation's in-state and out-of-state sales. The property and payroll factors are computed in the same manner. The three factors are averaged and the resulting fraction, expressed as a percentage, is multiplied by the corporation's business income. The resulting dollar amount constitutes the business income apportioned to this State.

290 Md. at 130, 428 A.2d 1208. To the corporation's apportioned income, the annual tax rate of seven percent is then applied.

From this statutory scheme, a multijurisdictional corporation must follow a two-step process in determining taxable income. First, the corporation must ascertain the total amount of its business income prior to allocation. In determining this preallocation amount, the corporate taxpayer begins with its federal taxable income, and then makes the appropriate adjustments, as the statute may require, pursuant to sections 280A and 316. Second, the corporation must then allocate the portion of its total income that is derived from trade or business within the State. Although two methods of apportionment are available, the statutorily-mandated, three-factor formula must be applied whenever the corporation is a "unitary business" or the Comptroller determines that separate accounting is impractical. Once the method is determined, the corporation must then apply

this apportionment factor to the preallocation net income in order to determine the amount of net income subject to tax.

B.

*Facts*

NCR manufactures and sells business machines, equipment, and related supplies and services at the wholesale and retail levels. Its principal place of business and corporate headquarters are located in Dayton, Ohio. For all six years at issue, NCR has maintained in Maryland several sales and service offices as well as a marketing-administrative office.

Through a network of foreign international subsidiaries, NCR has developed a worldwide market for its products. Of the ten subsidiaries, NCR owns one hundred percent interest in nine and seventy percent interest in the other. Each subsidiary retains control of its local management and determines such matters as the credit lines of its customers, market penetration, local advertising and acceptance or rejection of sales and customers. In contrast, NCR as the parent delineates the broad, global dimensions of this operation. Specifically, it controls the worldwide cooperative effort among the subsidiaries by setting guidelines for sales and establishing geographical sales locations. Moreover, NCR controls each subsidiary's Board of Directors and its longterm borrowing activities. When necessary, appellee makes loans to the subsidiaries.

Pursuant to licensing agreements, NCR grants each subsidiary the right to manufacture and sell business machines and equipment patented by NCR. In addition, NCR must supply its subsidiaries with all research, engineering, patentable and unpatentable know-how, and trade secrets. In consideration for these valuable rights, each subsidiary must pay as a royalty a percentage of the gross sales of licensed NCR products that the subsidiary has sold. No royalty, however, is due until the subsidiary has actually sold such products.

Based on these facts, the Tax Court determined that NCR's worldwide operations comprised a unitary business:

The business displayed unity of ownership; unity of operation as evidenced by central management; unity of use in its centralized executive force; and dependency of the subsidiaries on the parent.

Pursuant to article 81, § 316(c) of the Maryland Code, NCR was required as a multijurisdictional corporation with a unitary business to follow the two-step process outlined above in its computation of its taxable income. In its audits of NCR's income tax returns for the years 1972 through 1977, the Comptroller took exception to NCR's calculations and thus assessed additional taxes in the amount of $174,-421.00, plus interest.

On appeal to this Court, both steps in the process remain in dispute. First, the Comptroller contends that, in its calculation of preallocation income, it was improper for NCR to deduct two categories of income, gross up and domestic placement income, from its taxable business income. Second, the Comptroller contends that the second step of the process, i.e. the circuit court's determination of the apportionment factor, was flawed. In particular, appellant contends that the circuit court erred in requiring the modification of NCR's apportionment factor to reflect the property, payroll, and sales of its foreign subsidiaries. We will address each of these contentions in order, once we set forth the proper standard for reviewing determinations of the Tax Court.

## II.

### Standard of Review of Tax Court's Finding

Article 81, section 229(*o*) of the Maryland Code enunciates the standard under which the circuit court, as well as this Court, must review the findings of the Tax Court:

Decision of circuit court.—In any case, the circuit court for the county shall determine upon the record made in the Maryland Tax Court. The circuit court shall affirm the Tax Court order if it is not erroneous as a

matter of law and if it is supported by substantial evidence appearing in the record. In other cases, the circuit court may affirm, reverse, remand, or modify the order appealed from.

Pursuant to this standard, the degree of judicial scrutiny hinges upon the nature of the findings being reviewed. As to questions of law, the reviewing court has unlimited power of review and is entitled to substitute its legal conclusions, if the Tax Court's legal conclusions are erroneous. *Ramsay Scarlett & Company v. Comptroller of the Treasury,* 302 Md. 825, 834, 490 A.2d 1296 (1985). On the other hand, factual findings receive considerable deference in that a reviewing court may not reverse the Tax Court's factual findings if they are supported by substantial evidence. *Ramsay Scarlett,* 302 Md. at 834, 490 A.2d 1296. Finally, mixed questions of law and fact receive an intermediate level of scrutiny: such findings must be sustained if "in light of substantial evidence appearing in the record, a reasoning mind could have reached the [Tax Court's] conclusion." *Id.* at 838, 490 A.2d 1296.

This Court has had the opportunity on numerous occasions to apply the principles of section 229(*o* ) as delineated by the Court of Appeals in *Ramsay Scarlett. E.g. United Parcel Service, Inc. v. Comptroller of the Treasury,* 69 Md.App. 458, 518 A.2d 164 (1986); *Comptroller of the Treasury v. World Book Childcraft International, Inc.,* 67 Md.App. 424, 436–42, 508 A.2d 148 (1986); *Matthew Bender & Company, Inc. v. Comptroller of the Treasury,* 67 Md.App. 693, 703–12, 509 A.2d 702 (1986). In each instance, we followed a three-step analysis in our review of the Tax Court's findings:

1. First, the reviewing court must determine whether the agency recognized and applied the correct principles of law governing the case. The reviewing court is not constrained to affirm the agency where its order "is premised solely upon an erroneous conclusion of law."

2. Once it is determined that the agency did not err in its determination or interpretation of the applicable law,

the reviewing court next examines the agency's factual findings to determine if they are supported by substantial evidence, *i.e.,* by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* At this juncture, the *Ramsay, Scarlett* court reminds us that "it is the agency's province to resolve conflicting evidence, and, where inconsistent inferences can be drawn from the same evidence, it is for the agency to draw the inference."

3. Finally, the reviewing court must examine how the agency applied the law to the facts. This, of course, is a judgmental process involving a mixed question of law and fact, and great deference must be accorded to the agency. The test of appellate review of this function is "whether, . . . a reasoning mind could reasonably have reached the conclusion reached by the [agency], consistent with a proper application of the [controlling legal principles]". *United Parcel Service,* 69 Md.App. at 464–65, 518 A.2d 164 (quoting *World Book* ); *Matthew Bender,* 67 Md.App. at 705–06, 509 A.2d 702 (quoting *World Book* ); *World Book,* 67 Md.App. at 438–39, 508 A.2d 148.

Proper application of this methodological approach is contingent upon the reviewing court's distinguishing among the Tax Court's factual findings, legal conclusions, and applications of fact to law. The failure to make these discriminations will preclude the reviewing court from assessing the Tax Court's decision under the correct standard of review. With these principles in mind, we examine the Tax Court's determinations regarding the taxability of gross-up, the taxability of NCR's domestic placement interest, and the modification of NCR's apportionment formula to reflect worldwide values.

## III.

### *Taxation of Gross-up*

■ Gross-up is a concept that is employed in calculating a multinational corporation's tax liability under Federal

income tax law. Pursuant to sections 901–908 of the Internal Revenue Code (I.R.C.), domestic corporations that own at least ten percent of the voting stock of a foreign corporation from which it receives dividends has the option of claiming a foreign tax credit on the tax paid by its subsidiary to the foreign government. According to section 902 of the I.R.C., the domestic corporation "shall be deemed to have paid" a proportion of taxes actually paid or accrued by the foreign corporation. *See generally* 19 Fed.Tax Coordinator 2d (Res.Inst.Am.) 40,199–202; 34 AM.JUR.2D *Federal Taxation* § 8400 (1987). If a corporate taxpayer elects to take the foreign tax credit,[1] section 78 of the I.R.C. requires the domestic corporation to add to its gross income the amount of the deemed paid foreign taxes before it takes the credit. This amount is commonly referred to as "gross-up". *See generally Taxation and Revenue Department of New Mexico v. F.W. Woolworth Company,* 95 N.M. 519, 624 P.2d 28, 30–31 (1981) (explaining concept of gross-up in which the amount of the credit taken for the taxes paid by foreign subsidiary is deemed to be received as dividends).

In preparing its Maryland tax return for the year 1976, NCR did not include the gross-up figure as part of its business income. On audit, the Comptroller determined that pursuant to article 81, section 280A of the Maryland Code, NCR should have included this amount in its apportionable Maryland income and thus levied a tax on this omitted income. Although the Tax Court affirmed the

---

**1.** In the alternative, the taxpayer has the option of deducting such taxes from gross income pursuant to section 164(a)(3) of the I.R.C. In most cases, however, the tax credit would be preferable to this deduction:

It is generally advisable to take a credit against the federal income tax for the amount of income, etc., taxes paid foreign countries or U.S. possessions. If taken as a deduction in computing taxable income, the net reduction in tax liability is only the amount of the foreign taxes multiplied by the income tax rate applicable to the taxpayer in question. On the other hand, if claimed as a credit, the amount of such foreign taxes may offset dollar for dollar the U.S. income tax due.

19 Fed.Tax Coordinate 2d (Res.Inst.Am.) 40,199.

Comptroller's disallowance of NCR's deductions, the circuit court reversed, holding gross-up income is not taxable.

Section 280A(a) provides "[t]he net income of a corporation shall be the taxable income of such taxpayer as defined in the laws of the United States." Since section 78 of the I.R.C. requires NCR to include gross-up as part of federal taxable income, it is clear that gross-up is part of a business' taxable income when computing the Maryland return. Notwithstanding this express statutory language, the circuit court refused to include gross-up as part of NCR's apportionable Maryland income because of its "artificial" and "fictitious" nature:

> There is little doubt that the gross-up figure is an artificial one which does not represent particularized money or dividend income of NCR. Even the United States Supreme Court has termed the gross-up figure "fictitious" and strictly used for federal foreign tax credit purposes. *F.W. Woolworth Co.* [*Taxation and Revenue Dept. of New Mexico*], 458 U.S. [354] at 372 [102 S.Ct. 3128, 3139, 73 L.Ed.2d 819 (1982)]. The purpose of requiring a corporation which opts for the tax credit to make the artificial adjustments to its federal taxable income is to prevent a double benefit to the corporation.

We recognize that in reviewing the Tax Court's construction of section 280A, the circuit court possessed unlimited power of review and was thus authorized to substitute its legal conclusions for what it believed was the erroneous legal conclusions of the Tax Court. This substitution, however, is contingent upon the Tax Court's conclusion being erroneous as a matter of law. From our review of the statutory scheme, we agree with the Tax Court's construction of section 280A.

■ First, the plain meaning of section 280A clearly indicates that for 1976, NCR should have included gross-up as part of its taxable income in Maryland. Maryland income tax laws are "inextricably keyed" to the Internal Revenue Code. *Comptroller of the Treasury v. Diebold*, 279 Md. 401, 408, 369 A.2d 77 (1977); *accord Marco Associates, Inc.*

*v. Comptroller of the Treasury,* 265 Md. 669, 674, 291 A.2d 489 (1972) (stating that "the whole thrust of the Maryland Act is to impose a tax on the amount determined under the Internal Revenue Code as the adjusted gross income of an individual or the taxable income of the corporation"); *Katzenberg v. Comptroller of the Treasury,* 263 Md. 189, 204, 282 A.2d 465 (1971) (quoting the same language as *Marco* ); *Comptroller of the Treasury v. Chesapeake Corporation of Virginia,* 54 Md.App. 208, 218, 458 A.2d 459 (1983) (noting that "Maryland income tax laws were written 'with both eyes on the federal tax laws' "). An example of this interrelationship is section 280A(a), which provides that the amount a taxpayer reports on his federal taxable income is the amount on which the taxpayer computes its State income liability. This amount is binding on the taxpayer and must be used as the basis for determining Maryland taxes unless deductions are authorized pursuant to section 280A(c). For the years 1972–1975, section 280A(c)(4) authorized the deductions of gross-up by permitting taxpayers to subtract this "dividend interest". *See Woolworth,* 624 P.2d at 30–31. For the year 1977 and thereafter, the statute provides a more precise authorization to deduct gross-up: a taxpayer is entitled to subtract "any amounts included therein by operation of the provisions of § 78 of the Internal Revenue Code of 1954." Conspicuously absent, however, is the existence of an exclusion for the year 1976, the taxable year in which the deduction of gross-up is at issue.

The omission of a gross-up deduction is significant. Without explicit authorization to exclude gross-up income, corporations like NCR must include it as part of their Maryland taxable income. The circuit court's construction of the statute to the contrary is without merit. In its attempt to address the obvious absence of any statutory authority for NCR's deduction of gross-up, the circuit court simply hypothesized as to the true intent of the legislature when drafting the 1976 version of section 280A(c):

This Court agrees with NCR that the one year lapse in legislative action did not constitute an intentional taxing

of corporate dividend gross-up. Rather, the Legislature's inaction for the 1976 tax year was unintended.

Such an extensive revision of a statute, however, exceeds the bounds of judicial authority. It is well established in Maryland that "courts may not surmise a legislative intention contrary to the plain language of the statute, nor insert or omit words to make the statute express an intention not evident in its original form." *Government Employees Insurance Company v. Insurance Commissioner of Maryland,* 273 Md. 467, 480, 330 A.2d 653 (1974); *accord Board of Education of Garrett County v. Lendo,* 295 Md. 55, 62–63 (1982); *Baltimore Building and Construction Trades Council AFL–CIO v. Barnes,* 290 Md. 9, 15, 427 A.2d 979 (1981); *Saint Paul Fire & Marine Insurance Company v. Insurance Commissioner of Maryland,* 275 Md. 130, 141–42, 339 A.2d 291 (1975). Without a specific authorization to subtract gross-up income, the circuit court had no power to permit NCR's deduction of gross-up from its Maryland tax return.

Second, although the issue is one of first impression in Maryland, a multitude of courts in other jurisdictions have recognized that a state may subject gross-up income to taxation. *Albany International Corporation v. Halperin,* 388 A.2d 902, 905–06 (Me.1978); *Caterpillar Tractor Company v. Lenckos,* 77 Ill.App.3d 90, 32 Ill.Dec. 786, 395 N.E.2d 1167, 1176 (1979), *aff'd.* 84 Ill.2d 102, 49 Ill.Dec. 329, 417 N.E.2d 1343 (1981), *appeal dismissed sub nom. Chicago Bridge & Iron Company v. Caterpillar Tractor Company,* 463 U.S. 1220, 103 S.Ct. 3562, 77 L.Ed.2d 1402 (1983); *Woolworth,* 624 P.2d at 32–33, *rev'd on other grounds,* 458 U.S. 354, 102 S.Ct. 3128, 73 L.Ed.2d 819 (1982); *Commonwealth v. Westinghouse Electric Corporation,* 478 Pa. 491, 386 A.2d 491, 492–93, *appeal dismissed,* 349 U.S. 805, 99 S.Ct. 61, 58 L.Ed.2d 97 (1978). Overlooking this precedent, however, the circuit court relied on *In re Appeal of Norris Knosher,* 139 Vt. 285, 428 A.2d 1104 (1981), in which the Supreme Court of Vermont permitted a taxpayer to determine its Vermont income tax liability by recomputing his

federal income tax liability. Although this case did not involve gross-up income, the circuit court found the import of *Knosher* was compelling by analogy, for the purpose of interpreting the Maryland statute.

According to the facts of *Knosher*, the taxpayer received a partial tax credit for wages paid to certain new employees. In exchange for the tax credit, section 280C of the I.R.C. required the taxpayer not to claim a deduction for wages paid to the extent of the credit allowed. 428 A.2d at 1104. Because section 280C required the taxpayer to report his federal income in excess of his actual earnings, the court permitted the taxpayer to recalculate his federal tax liability as if he had taken a deduction for those wages rather than a credit. *Id.* at 1105–06. This precedent, in addition to being contrary to the plain meaning of the statute, is the minority rule. Accordingly, we do not view it as persuasive.

## IV.

### Domestic Placement Interest

NCR received total interest income of $17,856,121.00 in 1976 and $22,138,461.00 in 1977. Of that income, $6,440,-986.00 in 1976 and $4,044,691.00 in 1977, were from unitary sources such as finance charges, loans and advances to subsidiaries, and loans and advances to agents. Since these investments were directly involved in the sale of business machines, appellee concedes that they are subject to Maryland apportionment. A large portion of NCR's interest income, $11,415,135.00 in 1976 and $18,097,770.00 in 1977, was derived from investments of surplus funds in short-term certificates of deposits, commercial papers, government notes and municipal bonds. This latter interest income is commonly referred to as domestic placement interest.

On its Maryland tax returns, NCR deducted its domestic placement income from its preallocation taxable income. It argued that the investment of surplus funds was unrelated

to the manufacture and sale of business machines and asseverated that the interest therefrom was nonapportionable. The Comptroller took exception to NCR's deduction. In support of its position, the Comptroller pointed to the fact that the surplus funds invested came from NCR's profits in the sale of business machines; that the investments were short-term; that NCR did not segregate this income from its general revenue acquired by its sale of business machines; and that the proceeds of the investments "are available for whatever business reason may be necessary at that time, such as debt retirement, acquisition." Although this nexus may not be as direct as an interest bearing loan to a subsidiary or agent, the Comptroller contends that these investments are nonetheless sufficient to constitute an integral part of NCR's business operations.

Although for slightly different reasons, the Tax Court and circuit court rejected the Comptroller's attempt to tax NCR's domestic placement interest. Relying on *Mobil Oil Corporation v. Commissioner of Taxes of Vermont*, 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980), the Tax Court held the due process clause prohibited Maryland from taxing that portion of NCR's income, which was not part of its unitary business. The Tax Court found that

NCR has shown that the short term investments involved were not part of its unitary operation, i.e., the production and sale of business machines. Therefore, we interpret *Mobil Oil* to say that the apportionment of this interest income by the three-factor formula would violate the due process clause because this income does not represent profits derived from the functionally integrated unitary business of NCR operating in Maryland.

In reaching the same conclusion, the circuit court provided a more elaborate explanation. It pointed to several factors that militated against including this income as part of NCR's net business income subject to apportionment. First, the court suggested that investment of surplus cash in marketable securities differed so sharply from the enter-

prise of selling of business machines that the court was unable to see an operational connection under the concept of unitary business. Second, the court deemed relevant the fact that the interest payors, i.e. the banks, firms, and government entities involved in NCR's investments, were not part of the corporation's unitary business.

As we explained in section II, a tax court receives considerable deference regarding its factual and law to fact determinations. A reviewing court may not disturb findings of fact if they are supported by substantial evidence in the record. *Ramsay, Scarlett,* 302 Md. at 834, 490 A.2d 1296; *United Parcel Service,* 69 Md.App. at 464–65, 518 A.2d 164. Similarly, determinations involving mixed questions of fact and law must be affirmed if, after deferring to the Tax Court's expertise and to the presumption that the decision is correct, "a reasoning mind could have reached the Tax Court's conclusion." *Id.* at 465, 518 A.2d 164; *accord Ramsay, Scarlett,* 302 Md. at 838, 490 A.2d 1296.

Review of purely legal issues, however, is an all together different matter. A reviewing court does not assume a deferential posture, but possesses the unlimited power to scrutinize the Tax Court's legal conclusions and, if it determines they are erroneous as a matter of law, it may substitute the correct legal principles. *Ramsay, Scarlett,* 302 Md. at 834, 490 A.2d 1296; *World Book,* 67 Md.App. at 438–39, 508 A.2d 148. In the case *sub judice,* both the Tax Court's and circuit court's foci on the factors enumerated above indicate that each relied on the wrong legal standard in arriving at its ultimate conclusion. In particular, each delineated a too narrow conception of what constitutes a "unitary business".

▮ Pursuant to article 81, section 316(c) of the Maryland Code, the General Assembly authorized the Comptroller to tax a multijurisdictional corporation on as much of the corporation's net business income that may be constitutionally apportioned to the State of Maryland. To determine the boundaries of State taxation of foreign corporations, the

Supreme Court has provided considerable guidance. In *Mobil Oil*, the Court explained that the "linchpin of apportionability" is the finding of a "unitary business." 445 U.S. at 439, 100 S.Ct. at 1232. The Court, however, has never articulated a singular test for determining what constitutes a unitary business:

> A final point that needs to be made about the unitary business concept is that it is not, so to speak, unitary: there are variations on the theme, and any number of them are logically consistent with the underlying principles motivating the approach.

*Container Corporation of America v. Franchise Tax Board,* 463 U.S. 159, 167, 103 S.Ct. 2933, 2941, 77 L.Ed.2d 545 (1983). *See generally,* 1 J.R. Hellerstein, STATE TAXATION: CORPORATE INCOME AND FRANCHISE TAXES ¶ 8.11[4][g] (1983) (discussing the various factors in determining the parameters of a unitary business that the Supreme Court has recognized or established).

Because of shifting factual and economic circumstances in state apportionment disputes, the Supreme Court has relied on numerous factors in determining whether a foreign business activity is an integral part of a corporation's unitary business operations or whether it constitutes a discrete corporate enterprise. For example, the Court has recognized the factors of "functional integration, centralization of management, and economies of scale" as highly relevant in deciding this matter. *Mobil Oil,* 445 U.S. at 438, 100 S.Ct. at 1232. *Accord F.W. Woolworth Company v. Taxation and Revenue Department of New Mexico,* 458 U.S. 354, 364, 102 S.Ct. 3128, 3135, 73 L.Ed.2d 819 (1982); *see also Exxon Corporation v. Department of Revenue of Wisconsin,* 447 U.S. 207, 224–25, 100 S.Ct. 2109, 2120–21, 65 L.Ed.2d 66 (1980). "If such 'factors of profitability' arising 'from the operation of the business as a whole' exist and evidence the operation of a unitary business, a state can gain a justification for its tax consideration of value that has no other connection with that state." *Woolworth,* 458 U.S. at 364, 102 S.Ct. at 3135.

The Court has not limited its analysis of unitary business to these three factors. As another indication of prime importance, the Court has identified the degree to which goods flow between a subsidiary and the parent or between various branches of a single corporation. Obviously, the greater the flow of raw materials or products between entities involved, the greater is the likelihood that corporate unity exists. *See Exxon,* 447 U.S. at 225, 100 S.Ct. at 2121 (holding that corporate unity exists when Exxon's state petroleum business was dependent upon the general corporation's "assured supply of raw materials and crude"). In contrast, the likelihood of the existence of a unitary operation decreases with a decrease in the flow. For instance, a parent's purchase of a minimal amount of a subsidiary's output indicates that the parent's interest in the subsidiary is merely for investment purposes. *ASARCO, Inc. v. Idaho State Taxation Commission,* 458 U.S. 307, 322–23, 102 S.Ct. 3103, 3112–13, 73 L.Ed.2d 787 (1982) (holding the de minimis flow of products between the parent and its foreign affiliates ranging from 0.1% to 6%, indicated a lack of corporate unity). *See also Woolworth,* 458 U.S. at 371, 102 S.Ct. at 3138 (holding that there is no unitary business, in part, because "there is no flow of international business").

Moreover, the Supreme Court has repeatedly advised courts, when determining the propriety of apportionability, that they should not be distracted by the form in which the income is received:

> "One must look principally at the investment activity, not at the form of investment, to determine the propriety of apportionability.... Changing the form of the income works no change in the underlying economic realities of [whether] a unitary business [exists], and accordingly it ought not to affect the apportionability of income the parent receives."

*ASARCO,* 458 U.S. at 330, 102 S.Ct. at 3116 (quoting *Mobil Oil,* 445 U.S. at 440–41, 100 S.Ct. at 1233); *accord Exxon,* 447 U.S. at 223–24, 100 S.Ct. at 2120–21. *See also Comptroller of the Treasury v. Armco, Inc.,* 70 Md.App. 403, 521

A.2d 785, 795 (1987) (recognizing that the "Supreme Court has consistently applied an analysis keyed to 'economic realities' "). Under this methodological approach, courts must look beyond such superficialities as the form of the investment and apprehend whether the particular economic realities underlying the case indicate that the income was derived from an unrelated business activity, which constituted a discrete business activity.

With these principles in mind, we now address the lower courts' interpretation of the unitary business and ask whether their restrictive interpretation of the unitary business concept was proper as a matter of law.

■. The facts of the instant case suggest that this is not a typical apportionment issue in which a court must determine the relationship between a parent and its foreign subsidiary, i.e. whether the entities involved constituted a corporate unity or discrete businesses. Here, we deal not with the flow of income between the parent and its subsidiaries or other discrete entities, but rather with the flow of interest income derived from investment activity within the corporate unity. Because these investments ostensibly bore no direct relationship to its business of selling business machines, NCR contends that the income derived therefrom is nonapportionable under section 316(c). We do not agree.

The economic realities underlying NCR's investments in marketable securities suggest that such investment activity was not a discrete business enterprise, but part of NCR's unitary business. First, the source and application of the investment funds indicate that NCR's investment activities and its sale of business machines were closely integrated and run as part of the unitary business. NCR's financial records reveal that the investment capital was produced through the sale of business machines. With these profits, NCR made short-term investments in certificates of deposits, commercial paper, government notes and municipal bonds. The principal and interest from these were used or

available for immediate use in NCR's general business operation for a myriad of corporate business purposes.

Second, NCR's systems of banking and record keeping indicate an integrated operation. In its opinion, the circuit court accurately described this elaborate system as follows:

Payments from business machine sales are directed to one of eleven banks or lock boxes and then funnelled to a holding bank. Surplus funds are then directed to a general fund. With domestic placement income, the receipts are forwarded directly to the general fund. From this fund, checks may be drawn where one of NCR's holding banks needs cash or where money is necessary for expansion. No distinction is made as to the source of the funds. In the cash management office, one part-time employee handles all short-term investments.

From the circuit court's description, it is evident that NCR operated a simple general account to which a network of secondary holding accounts were linked. Into and through this general account, NCR funnelled revenue from both its sales of business machines and its investment activities. Since the domestic placement income was comingled with income from its general operations, that interest income "was available for whatever business reason may be necessary at that time." As a result, NCR used this income routinely for such general business purposes as general cash flow needs, expansion or debt retirement.

Notwithstanding this factual scenario, NCR points out that the banks, government agencies and other organizations that issued these short-term interest bearing instruments are not part of NCR's unitary business, the production and sale of business machines. The relationship between the interest payor and NCR, or lack thereof, however, is not dispositive on the issue of whether a corporate unity exists. In a recently decided case, this Court held that "the lack of unitariness between the taxpayer and payor corporation" does not *"per se* [preclude] the State from taxing any income the taxpayer received from the payor." *Comptroller of the Treasury v. Armco, Inc.,* 70

Md.App. 403, 521 A.2d 785, 793, (Md.App.1987). In remanding the case to the Tax Court,[2] Judge Pollitt, on behalf of this Court, explained that the court must inquire further into the intra-corporate relationship. Specifically, it must determine whether the taxpayer's activities incident to earning the interest income were part of the taxpayer's business activities in Maryland or merely a discrete business enterprise. *Id.* 521 A.2d at 795.

In *Armco,* the corporate taxpayer asserted that because the interest income at issue was derived from an investment in a nonunitary corporation, that income could not be taxed by the State. The taxpayer sought support for this position in *ASARCO, supra.* Our review of *ASARCO* found nothing there that overruled the earlier holding of the Court of Appeals in *Xerox Corp. v. Comptroller of Treasury,* 290 Md. 126, 428 A.2d 1208 (1981), that dividend income could be taxed by the State if earned as part of the taxpayer's unitary business. In fact, our review of *ASARCO* and other Supreme Court cases convinced us that the same analysis applied to dividend or interest income, the superficial form of the income being irrelevant and the real focus turning on the "economic realities" of the corporate transaction.

Support for this position is found in other jurisdictions, where courts have focused on whether the investment income arose from the regular course of the taxpayer's business. *See, e.g., Silent Hoist & Crane v. Director, Division of Taxation,* 100 N.J. 1, 494 A.2d 775, 783–86 (1985) (holding that corporation's real estate, investment activity was part of its unitary business and thus its portfolio income was correctly included in its apportioned income); *Lone Star Steel Company v. Dolan,* 668 P.2d 916, 922 (Colo.1983) (holding "interest derived from short-term notes

---

**2.** The record in this case differs substantially from that of *Armco.* In *Armco,* the sparse record required us to remand the case for additional fact-finding. In contrast, the record here is so complete that we may decide the issue as a matter of law.

is an integral part of Lone Star's business," since "[t]he surplus finds are produced by that business, the investments are short-term, liquid, made with the intent that both the principal and interest are to be used 'in the regular course of the taxpayer's trade or business' "); *Sperry and Hutchinson Company v. Department of Revenue,* 270 Or. 329, 527 P.2d 729, 730–31 (1974) (holding that corporation's interest from short-term securities held pending use of funds in its regular business operation was apportionable). *Compare ASARCO,* 458 U.S. at 323–327, 102 S.Ct. at 3112–3115 (characterizing taxpayer's holdings as merely passive investments and stating that a rule that would allow the State to tax these dividends and income would destroy the concept of unitary business).

## V.

### *Worldwide Apportionment* [3]

Having ascertained the total business income of NCR, the next step in the process is to determine the amount of that income "attributable to the trade or business carried on within this State." MD.CODE ANN. art. 81, § 316(c) (1980). To determine the proper allocation, Maryland follows the three-factor formula approach, pursuant to which equal weight is given to property, payroll, and sales of the corporate taxpayer's total operation. In general, the formula determines a taxpayer's income tax base within a particular state by the average ratio of:

$$\frac{\text{Sales in state}}{\text{Sales everywhere}} + \frac{\text{Property in state}}{\text{Property everywhere}} + \frac{\text{Payroll in state}}{\text{Payroll everywhere}}$$

Multiplying this ratio against the corporation's total income determines the income apportionable to the state. *See generally,* 14A R. EICKHOFF & P. DEOCA, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS, § 6970.2 (1980); Comment, *Unitary Taxation: An Analysis of State Taxation of Multijurisdictional Corporations in Nebraska,* 64 NEB.L.REV. 135, 150–51 (1985).

---

**3.** See footnote 4 p. 140, *infra.*

In the great majority of the states,[4] the three-factor formula has been adopted as the method for calculating income apportionable to the taxing state. *See Container Corporation*, 463 U.S. at 172, 183, 103 S.Ct. at 2943, 2949; FLETCHER CYCLOPEDIA, *supra* § 6970.2, at 176. Moreover, the Supreme Court has embraced this method of apportionment as the "benchmark against which other apportionment formulas are judged." *Container Corporation*, 463 U.S. at 170, 183, 103 S.Ct. at 2943, 2949. On appeal, NCR does not question the validity of the three-factor formula as a whole, but rather challenges the Comptroller's particular implementation of that formula. Specifically, NCR argues that the circuit court was correct in ordering a modification in the sales, payroll and property factors to reflect worldwide those factors of the NCR subsidiaries which produced its royalty and foreign subsidiary dividends.[5] Because neither the statute nor the Constitution mandates this conclusion, we hold that the circuit court was incorrect to require the modification.

Of its ten foreign international subsidiaries, NCR owns one hundred percent interest in nine and seventy percent interest in the other. From this investment, NCR receives dividend income. NCR also has entered into licensing agreements with these subsidiaries. Pursuant to such agreements, the foreign subsidiaries pay NCR royalties to use NCR's trademarks and its patentable and nonpatentable trade know-how and trade secrets. Both the Tax Court and circuit court upheld the Comptroller's right to tax this royalty and dividend income for the years 1976 and 1977.

NCR argues that since it must pay Maryland taxes on the royalty and dividend income, the apportionment factor used to calculate its taxable income should include not only the total sales, property and payroll of the domestic parent

---

**4.** At last count, forty-two states employ the three-factor formula. *Unitary Taxation, supra* at 149.

**5.** In this opinion we refer to this modification as the use of "worldwide values."

corporation, but also of the foreign subsidiaries. According to NCR,

> Maryland should not be permitted to reap the benefit of taxing a share of a larger income pool without the requirement of recognizing the payroll, sales and property values in other jurisdictions which produced that income. Unless these additional values are included in the apportionment formula, the apportionment result will not by definition "justly and fairly determine the portion [of income] derived from or reasonably attributable to the business of [NCR] carried on in [Maryland]" and outside Maryland as required by Section 316(c).

Appellee's Brief at 31. We disagree.

First, the statute does not warrant NCR's conclusion. Section 316(c) does not explicitly require the Comptroller to use worldwide values of property, payroll, and sales to compute the apportionment factor. Rather, it merely requires a reasonable attribution of a corporation's income. MD.ANN.CODE art. 81, § 316(c) (1980).

To determine what constitutes a reasonable attribution, it is necessary to examine the statutory scheme within which section 316(c) functions. Under this framework, the Comptroller possesses no authority to tax NCR's foreign subsidiaries either collectively, as a part of NCR's total business, or individually on a separate return. As to combined returns, article 81, section 295 of the Maryland Code precludes NCR from reporting the income of its foreign subsidiaries as part of its total Maryland taxable income. *See Chesapeake Industries, Inc. v. Comptroller of the Treasury*, 59 Md.App. 370, 475 A.2d 1224 (1984) (holding that Maryland law prohibits use of combined reporting). As to individual returns, the Constitution prohibits the taxation of corporations doing no business within the State. Since NCR's affiliates do not conduct any business in Maryland, the State has no power to tax these subsidiaries individually.

Notwithstanding the fact that the income of NCR's foreign subsidiaries is not taxable in Maryland, NCR argues

for inclusion of NCR's worldwide values of property, payroll and sales on the ground that Maryland taxes NCR's royalty and dividend income from the foreign subsidiaries. This income, however, is irrelevant to the matter at hand. The royalty and dividend income is taxable, not as income of the foreign subsidiaries, but as income of the domestic parent earned in the ordinary course of its unitary business, the production and sale of office machines. Since NCR's taxable income does not reflect the actual income earned by any of its foreign subsidiaries, we think that the apportionable formula should mirror this approach. Accordingly, we hold that the worldwide values of sales, property and payroll should be excluded from the apportionment factor. To incorporate this value, as NCR suggests, would produce a gross distortion in the apportionment formula, which unduly favors taxpayers such as NCR.

Finally, in reviewing the constitutionality of a state's apportionment formula, the Supreme Court has explained that the burden of proof is placed on the taxpayer with considerable deference accorded to the taxing state:

> The Constitution does not "invalidat[e] an apportionment formula whenever it *may* result in taxation of some income that did not have its source in the taxing State...." *Moorman Mfg. Co., supra,* 437 U.S. at 272, 98 S.Ct., at 2344 (emphasis added). See *Underwood Typewriters Co.* [*v. Chamberlain*], 254 U.S. [113], at 120–212, 41 S.Ct. [45], at 46–47 [65 L.Ed. 165 (1920)]. Nevertheless, we will strike down the application of an apportionment formula if the taxpayer can prove "by 'clear and cogent evidence' that the income attributed to the State is in fact 'out of all appropriate proportions to the business transacted ... in that State,' [*Hans Rees' Sons, Inc. v. North Carolina*], 283 U.S. [123] at 135, 51 S.Ct. [385] at 389 [75 L.Ed. 879 (1931)], or has 'led to a grossly distorted result,' [*Norfolk & Western R. Co. v. State Tax Comm'n,* 390 U.S. 317, 326, 88 S.Ct. 995, 1001, 19 L.Ed.2d 1201 (1968)]." *Moorman Mfg. Co., supra,* 437 U.S., at 274, 98 S.Ct., at 2345.

*Container Corporation*, 463 U.S. at 169–70, 103 S.Ct. at 2942; *accord Xerox Corporation v. Comptroller of the Treasury*, 290 Md. 126, 146–47, 428 A.2d 1208 (1980) (quoting *Moorman Manufacturing Company v. Blair*, 437 U.S. 267, 274, 98 S.Ct. 2340, 2345, 57 L.Ed.2d 197 (1978)); *See Armco*, 521 A.2d at 792 (stating that "the constitutionality of the State tax is presumed, and the taxpayer has the distinct burden of showing by clear and cogent evidence that the State tax results in extra-territorial [and hence unconstitutional] values being taxed"). In the case *sub judice*, NCR has presented no clear or cogent evidence for invalidating the apportionment formula. The fact that Maryland taxes NCR's dividend and royalty income from its foreign subsidiaries is of no relevance. With NCR having thus failed to meet its burden of proof, we hold there is no constitutional reason to disturb the Comptroller's implementation of the three-factor apportionment formula.

JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY WITH DIRECTIONS TO REMAND TO THE MARYLAND TAX COURT FOR THE ENTRY OF AN ORDER CONSISTENT WITH THIS OPINION;

COSTS TO BE PAID BY APPELLEE.